# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## Appeal Number: 24-10086-D

_____

## RYAN SULLIVAN, ET AL.,
### Appellants/Defendants below

### v.

## EMMA JANE PROSPERO,
### Appellee/Plaintiff below

_____

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION
## USDC CASE NUMBER: 2:20-cv-110-LGW-BWC

_____

## BRIEF OF APPELLANTS
_____

### BRADLEY J. WATKINS
### EMILY R. HANCOCK
### AMANDA L. SZOKOLY
### BROWN, READDICK, BUMGARTNER,
### CARTER, STRICKLAND & WATKINS, LLP
### Post Office Box 220
### 5 Glynn Avenue
### Brunswick, Georgia 31520
### 912-264-8544 (O)
### 912-264-9667 (F)
### bwatkins@brbcsw.com
### ehancock@brbcsw.com
### aszokoly@brbcsw.com
### ATTORNEYS FOR APPELLANTS

Appeal Number: 24-10086
*Sullivan, et al. v. Prospero*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned Counsel of Record for Defendants/Appellants, in accordance with Rule 26.1 of the United States Court of Appeals, Eleventh Circuit, certify that the following is a full and complete list of all persons, firms, associations, partnerships, and corporations, including subsidiaries, conglomerates, affiliates, parent corporations, and other legal entities having an interest in the outcome of this case:

| | |
|---|---|
| Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, LLP | Attorneys for Appellants |
| Cheesbro, Benjamin W. | United States Magistrate Judge |
| Hancock, Emily R. | Attorney for Appellants |
| Norins, Clare | Attorney for Appellee |
| Prescott, Russell | Appellant |
| Prospero, Emma Jane | Appellee |
| Sullivan, Ryan | Appellant |
| Szokoly, Amanda L. | Attorney for Appellants |
| The Travelers Companies, Inc. (TRV) | Insurance Carrier for Appellants |
| Watkins, Bradley J. | Attorney for Appellants |
| Wood, Lisa G. | United States District Judge |

This 7th day of May, 2024.

/s/ Bradley J. Watkins
Bradley J. Watkins
Georgia Bar No. 740299
bwatkins@brbcsw.com

/s/ Emily R. Hancock
Emily R. Hancock
Georgia Bar No. 115145
ehancock@brbcsw.com

/s/ Amanda L. Szokoly
Amanda L. Szokoly
Georgia Bar No. 403412
aszokoly@brbcsw.com


**ATTORNEYS FOR APPELLANTS**


BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue (31520)
Post Office Box 220
Brunswick, GA 31521-0220
(912) 264-8544
(912) 264-9667 FAX

Appeal Number: 24-10086
***Sullivan, et al. v. Prospero***

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument pursuant to Fed. R. App. P. 34. Appellants believe that oral argument will benefit the Court and the parties by allowing a full and complete presentation of the legal issues necessary to a resolution of this appeal. In addition, this appeal provides an opportunity to discuss the parameters of clearly established law, which may serve to reduce the number of law enforcement officers who are subjected to protracted litigation in instances in which qualified immunity applies.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR APPEAL ............................ 2

STATEMENT OF THE CASE ................................................................. 4

    I.    Statement of Facts ................................................................ 4

    II.   Course of Proceedings ......................................................... 16

SUMMARY OF THE ARGUMENT ......................................................... 18

ARGUMENT AND CITATION OF AUTHORITY ......................................... 20

    I.    The district court applied an improper qualified-immunity standard. ................................................................................ 20

    II.   Had the district court applied the correct qualified immunity standard, it would have been constrained to conclude that the warrant affidavit was supported by at least arguable probable cause. ............................ 24

    III.  Even under an improper qualified-immunity standard focusing solely on the contents of the warrant affidavit, the trial court erred in holding that the warrant affidavit did not establish arguable probable cause .. 34

IV.    The district court erred when it held that Prospero's alleged subjective purpose or motivation behind making the calls created a genuine issue of material fact regarding whether her speech was protected by the First Amendment. ..........................................................................50

CONCLUSION ........................................................................54

CERTIFICATE OF COMPLIANCE.......................................................56

iii

# TABLE OF AUTHORITIES

## Federal Cases

*Al-Hakim v. Roberts*, No. 8:08–cv–01370, 2009 WL 2147062 (M.D. Fla. Jul. 13, 2009) ....................................................................................................27

*Carter v. Gore*, 557 Fed. Appx. 904 (11th Cir. 2014)............................................35

*Coward v. Simone*, No. 1:11-CV-00383, 2012 WL 4381270 (N.D. Ga. Sept. 24, 2012) ..................................................................................................47

*Craig v. Singletary*, 127 F.3d 1030 (11th Cir. 1997)............................................25

*Czapiewski v. Russell*, 15-CV-208-BBC, 2016 WL 3920503 (W.D. Wis. July 18, 2016) ................................................................................................51, 52

*Fleming v. Barber*, 383 F. App'x 894, 897 (11th Cir. 2010) ..................................33

*Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)...........34

*Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) ......................................25

*Gay v. Cobb County, Ga.*, 2019 WL 5530893 (N.D. Ga. Oct. 25, 2019)  ........26, 47

*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 136 S. Ct. 1412, 194 L. Ed. 2d 508 (2016) ..................................................................................................51

*Hilmo v. Jackson,* No. 22-13015, 2023 WL 4145495 (11th Cir. June 23, 2023)........ ....................................................................................................32, 36

*Johnson v. Shannon*, 484 F. Supp. 3d 1344 (N.D. Ga. Aug. 28, 2020).............34, 36

*Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999) .................................................36

*Jordan v. Mosley*, 487 F.3d 1350 (11th Cir. 2007) ..................................................44

*Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994)........................................ 34-36

*Kinnemore v. Cochran,* 4:19-CV-00281-WMR, 2021 WL 1711563 (N.D. Ga. Mar. 24, 2021), *aff'd,* 21-11360, 2021 WL 5356281 (11th Cir. Nov. 17, 2021) .............21

*Lampley v. Davis*, No. 3:10-CV-00711, 2010 WL 4105621 (N.D. Ohio Oct. 18, 2020) ..............................................................................................................29

*Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)................................17, 44, 51

*Luke v. Gulley*, 50 F.4th 90 (11th Cir. 2022) ..........................................................36

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir.1996) ...............................................1

*Mehta v. Foskey*, No. CV 510-001–LGW, 2013 WL 1808764 (S.D. Ga. 2013) ....47

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................1

*Paez v. Mulvey*, 915 F.3d 1276 (11th Cir. 2019) ...............................................37, 43

*Scott v. Escambia County Sheriff's Office*, 3:19-CV-03539-RV-HTC, 2019 WL 6831447 (N.D. Fla. Oct. 28, 2019) .................................................................28, 29

*Taylor v. Taylor*, 649 F. App'x 737 (11th Cir. 2016).........................................29, 47

*United States v. Everett*, 719 F.2d 1119 (11th Cir. 1983) .................................44, 51

*United States v. Railey*, 481 Fed. Appx. 545, 548 (11th Cir. 2012).......................33

*United States v. Wehrl*e, No. CR406-333, 2007 WL 521882 (S.D. Ga. Feb. 14, 2007) ................................................................................................25, 47

*Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022) ......................................... 47

*Watkins v. Central Broward Reg'l Park*, 799 Fed. Appx. 659 (11th Cir. 2020)......53

*Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020)....................................... 20-22

**Federal Statutes**

42 U.S.C. § 1983 ......................................................................................................1

28 U.S.C. § 1331 ......................................................................................................1

**State Statutes**

O.C.G.A. § 16-11-39.2............................................................. 15, 31, 39, 43, 44, 46

O.C.G.A. § 46-5-122................................................................................................15

## JURISDICTION

This case asserts alleged violations of the First and Fourth Amendments under 42 U.S.C. § 1983. The district court had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction as this appeal involves a review of the denial of qualified immunity to Appellant Sullivan on Appellee Prospero's First Amendment retaliation claim (Count I) and to Appellants Sullivan and Prescott on Appellee Prospero's malicious prosecution claim arising under the Fourth Amendment (Count III). The denial of qualified immunity makes the district court's otherwise interlocutory order immediately appealable.[1]

Appellants timely filed their notice of appeal pursuant to Fed. R. App. P. 4(1)(A) because it was filed within 30 days of the order appealed from, which is the district court's order on the parties' respective motions for summary judgment. *See Doc. 234.*

---

[1] *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *McMillian v. Johnson*, 88 F.3d 1554 (11th Cir.1996).

1

**STATEMENT OF THE ISSUES PRESENTED FOR APPEAL**

1) In 2020, this Court clearly established for the first time that facts known to an officer, but not included in a warrant affidavit, cannot be considered when evaluating whether an ensuing arrest was supported by arguable probable cause. The arrest at issue in this case occurred in 2019. Did the trial court err when it explicitly applied the 2020 arguable-probable-cause standard and based its analysis solely on the contents of the warrant affidavit and in failing to conduct a separate and distinct analysis of whether the arrest would have been justified without legal process?

2) The collective knowledge doctrine imputes knowledge among cooperating law enforcement officers, including dispatchers, so long as they are in at least minimal communication during an investigation. It is undisputed that a dispatcher told Appellant Sullivan, during Sullivan's investigation, that Appellee had purposefully disrupted the 911 Center. Did the trial court err when it disregarded this, and other information known by or at least imputed to Sullivan, in holding that Sullivan did not have at least arguable probable cause to arrest Appellee for disrupting the 911 Center?

2

3) An arrest-warrant affidavit is constitutionally infirm if it contains material, intentional, or reckless misstatements or omissions. At the time of the incident, the law was not clearly established that *reckless* but not *intentional* misstatements or omissions were sufficient to defeat qualified immunity. Did the trial court err in ignoring the testimony of the magistrate judge who issued the arrest warrant and in holding that a jury issue was presented as to whether alleged "reckless or intentional" misstatements or omissions in the warrant affidavit created a jury issue in the case?

4) An arrest does not violate the First Amendment if the arresting officer reasonably believes that the plaintiff's speech preceding the arrest was not constitutionally protected. This inquiry focuses solely on how a reasonable officer, or judge, would have perceived the plaintiff's speech, not on a plaintiff's subjective intent in making the speech at issue. Did the trial court err when it denied qualified immunity on Appellee's First Amendment claim because Appellee maintains that her repeated calls to law enforcement were for safety reasons rather than for a non-emergency noise complaint?

3

## STATEMENT OF THE CASE

### I.    Statement of Facts

#### A.    *Appellee's history with the Camden County Sheriff's Office*

Appellee Emma Jane Prospero ("Prospero") - whom the district court characterized as a "serial 911 caller"[2] – was arrested after repeatedly making calls received by the Camden County 911 Center ("911 Center") on November 22, 2018, which was Thanksgiving Day.

After moving to Camden County in 2011, Prospero began regularly calling the Camden County Sheriff's Office ("Sheriff's Office") by way of the emergency 911 line. *Doc. 127*, 39:10-16, 40:13–16. In fact, by December 13, 2013, Prospero estimated that she had called the Sheriff's Office hundreds of times. *Id.,*33:16–25, 34:1-20; *Doc. 172-2*. Prospero is unable to specify how many times she has called law enforcement over the last 20 years – "I couldn't even put a number on it" – but acknowledges it is a "big number" and that she had called the 911 Center "a gazillion times" before the date of this incident. *Doc. 127*, 29:22, 176:1. The subject of Prospero's calls varied and frequently involved non-emergency issues such as

---

[2] *See Doc. 234*, p. 2.

4

objections to duck noises, ducks in her yard, a cat wandering on her property, and noise complaints about barking dogs.[3] *Doc. 127,*121-125, 135, 141-142.

Prospero most frequently called the Sheriff's Office and the 911 Center to report the sound of gunshots. *Doc. 127-6, 127-7*. As noted by the district court, "[t]he gunfire came from the same location, a property near Prospero's home located behind a Chevron gas station," which the Sheriff's Office understood as early as 2015 to be a hunting club. *Doc. 234*, p. 3; *Doc. 127*, 222:10-14; *Doc. 127-6,* p. 33. The district court correctly recognized that the "Sheriff's Office repeatedly investigated the gunfire and repeatedly came to the same conclusion that the gunfire was legal and safe." *See Doc. 234*, pp. 3-4; *Doc.127-6*, pp. 17, 18, 26, 27, 34; *Doc. 127-7*, pp. 6, 12.

Prospero was undeterred by these investigative findings because her goal was to stop the hunting of any animals. Prospero believes that the killing of animals is the "largest social justice issue since the freeing of slaves" and claims to be "winning the war" against hunting. In reference to the reason for her arrest at issue in this case,

---

[3]Prospero's deposition transcript contains a lengthy discussion of some of her emergency and non-emergency calls to the Sheriff's Office and the 911 Center that began as early as April 1, 2011. *Doc. 127,* 41-142; *See also Doc. 127-6*; *Docs. 127-7, 127-14, 127-15, 127-16, 127-17, 127-18.*

Prospero opined in a social media post that she has been successful at getting "a LOT of hunting stopped here . . . so they came after me." *Doc. 217-1*.

Sometimes, like in January 2015, Prospero would call as many as three times in a row about a single noise complaint. *Doc. 127*,114-116; *Doc. 127-6*, pp. 32-33. If Prospero did not get the response she sought from calling the non-emergency line, she would then call 911. *Doc. 127-10*. Prospero frequently called to complain about her neighbors. *Id.*[4]  On one occasion, after speaking with the operator for the non-emergency number for 35 minutes, Prospero then called 911 to voice the same complaint. *Doc. 127-10,* p. 6.

Appellant Lieutenant Russell Prescott ("Prescott") was well aware of Prospero's history of calls and complaints related to non-emergency issues where no unlawful conduct was occurring.[5] In fact, prior to the subject incident, Prescott personally responded to and investigated at least five calls for service made by Prospero.[6] *Doc. 135*, 25:18-23, 28-58; *Doc. 127*, 63-64. All of these calls for service

---

[4] *Also see Doc. 127-8*, pp. 8, 2.

[5] Prescott was Appellant Deputy Ryan Sullivan's ("Sullivan") supervisor on November 22, 2018 and participated in the decision to seek an arrest warrant against Prospero. *Doc. 135*, 25:18-23.

[6] For instance, in July 2012, Prescott responded to Prospero's complaint of gunshot noise and determined there was no violation occurring. *Id.,* 41-44; *Doc. 135-4*, p. 1. In December 2012, Prescott responded to another complaint by Prospero of gunshots

involved simple noise complaints coming from gunshots where no unlawful activity was observed. *Doc. 135*, 57:7-25. The supervising dispatcher in this case, Susan Flowers ("Flowers"), was also familiar with Prospero's history of calls to the 911 Center. *See Doc. 137*, 54:22-24, 162:1-14. Flowers had handled calls about shooting noise from Prospero in the past. *Id.,* 47:1-4. In fact, Flowers knew that Prospero and her husband "continually called" the 911 Center about their neighbor "in addition to all of their 911 calls about the shots." *Id.*, 52:19-24. Flowers also knew that in response to similar calls from Prospero, deputies determined that the shooting was occurring at a hunting club on private property. *Id.*, 55:14-18. Prospero acknowledges that dispatchers were aware of her history of complaints. *See Doc. 127*,143:21-25, 144:1-12.

Prospero justifies calling the 911 Center so frequently because she claims that Sheriff James Proctor ("Sheriff Proctor") and his Chief Deputy, Colonel Byerly, told Prospero and her husband, "the squeaky wheel gets the oil," which Prospero

---

and it was determined that the neighbor's shooting was lawful. *Doc. 135-4*, p. 2; *Doc. 135*, 45-47. On April 18, 2013, Prescott responded to another complaint from Prospero regarding shooting but nothing unlawful was occurring. *Doc. 135*, 48-51; *Doc. 135-4*, p. 3. On May 26, 2013, Prescott responded to Prospero's residence in response to a complaint about shots being fired and unrelated alleged damage to a fence sign. *Doc. 135*, 30-34; *Doc. 135-3*. On July 12, 2013, Prescott responded to a "loud noise" complaint from Prospero about someone shooting. *Doc. 135*-4, p. 5; *Doc. 135*, 53.

subjectively interpreted as meaning that whenever she heard a gunshot, she should call and report it. *Doc. 127*, 8-12. However, Prospero cannot say when she was so instructed or even what year that occurred, and there is no evidence that the dispatchers or deputies involved in this incident were aware of any such instructions. *Id.*, 322:13-25, 324:1-25, 325:1-20. In any event, Prospero admits that she did not take the sheriff's alleged comment to mean that she had permission to disrupt or interfere with the 911 Center. *Id.*, 325:21-25, 328:1-13. Prospero agrees that it is appropriate for somebody to be arrested if they purposefully interfere with an emergency 911 service. *Doc. 130*, 36:8-12.

Before the events at issue in November 2018, Prospero and her husband met with Sheriff Proctor "many times" to voice various complaints, including a meeting that lasted as long as four hours. *Doc. 127*,119, 126. Prospero also sent a barrage of emails to Proctor in 2017 setting forth a myriad of unreasonable requests, including demands that Sheriff Proctor personally come to her house to observe ducks on her neighbor's property and investigate a neighbor's wandering cat. *See Doc. 127-12*; *Doc. 127*, 257:16-25, 258:1-5. When Prospero failed to get her way, she threatened Sheriff Proctor with "going to the media again" and claimed she would "put ads out THIS evening asking ANYONE that has had problems with the sheriff's office to

contact us." *Id.*, 8. These are the same types of threats made to the 911 Center on the day of the subject incident.

Regarding her many prior complaints of gunshot noises, Prospero claims that the Sheriff's Office had always stopped the shooting immediately whenever she called. However, as recognized by the district court, "records of Prospero's calls belie that notion and indicate that the [Sheriff's Office] repeatedly determined the shooting noise complained about by Prospero was perfectly lawful." *Doc. 234*, p. 11.

Sheriff Proctor eventually decided to address Prospero's nonstop barrage of phone calls and complaints. *Doc. 133*, 31-34. Sheriff Proctor explained that "[a]fter multiple phone calls to my office, the 911 Center, the dispatch, multiple, multiple phone calls, . . . it always seemed as though they were targeting the neighbors for various things . . . a lot about the shooting." *Id.,* 31:20-24. Sheriff Proctor believed that Prospero was trying to use "[his] office to further her interests in the neighborhood. Such as the shooting, she was apparently very opposed to anybody shooting anywhere in the neighborhood, even in the adjoining wooded lands." *Id.,* 31:25, 32:1-5. As such, on May 10, 2017, Sheriff Proctor wrote a letter to Prospero clearly instructing her to only call the 911 Center for emergencies and to call the non-emergency number for other non-emergency issues:

9

We have addressed the duck situation, and if you want the ducks removed from the community pond, they will have to be captured on your property and removed.

In your email you've stated, I've made promises about protecting you from your neighbor Stacey, however, I've told you if you feel threatened to call 911 and a deputy will be dispatched to your location. I will not allow you, nor anyone else, to use my office to further your personal agendas. If you have an emergency call our 911 Center or if you have a concern, feel free to call the non-emergency number (912) 729-1442.

*Docs. 127*, 135-136; *127-13; 133-2*. Thus, only about 18 months before this incident, Prospero was explicitly warned by Sheriff Proctor to only use the 911 line for an emergency call. Sheriff Proctor explained that in writing the letter, he "was trying to impress upon her the fact that the 911 Center, you know, this is for emergencies. This other number is for non-emergencies." *Doc. 133*, 32:1-5.

### B.    *Prospero's calls on November 22, 2018*

On November 22, 2018, Prospero and her husband placed three calls that were received by the 911 Center within a 16-minute period concerning the same non-emergency complaint: gunshot noises coming from rural property behind a Chevron truck stop.[7] The nature and substance of the calls are documented in voice recordings and transcripts of the calls and set forth in detail in the district court's summary

---

[7] The first two calls were placed to the sheriff's non-emergency number and transferred to the 911 Center. The third call was a 911 call that was made to and received by the 911 Center.

10

judgment order. *See Doc. 234*, pp. 5-8; *Docs. 54-1, 54-2, 54-3, 54-4, 54-5, 54-6.* Prospero spoke with dispatcher John Archibald ("Archibald") on all three calls. Dispatcher Flowers – as Archibald's supervisor – was involved in the handling of the calls and took over the third call from Archibald when the conversation became argumentative.

After the first call complaining about the shooting noise, the 911 Center radioed Deputy Sullivan and advised him that the caller was "hearing shots coming from behind [the Chevron station]. She wants it to stop so she can enjoy her dinner." *Doc. 149-10*, p. 2. Sullivan then responded that the shooting noise was coming from private property and that he knew who was doing the shooting – "I am familiar with who that is." *Doc. 137-2.* Sullivan asked if the caller wanted contact from law enforcement and was told by the 911 Center that the caller did not. *Id.*

During the second call received by the 911 Center – placed less than 4 minutes after the first call – Archibald informed Prospero that the 911 Center had "received a call on it already" and repeatedly relayed that the shooting was coming from private property. *Docs. 54-3, 54-4.* Archibald offered contact from a deputy two times, but again Prospero refused each offer. *Id.* Instead, Prospero argued the shooting was "illegal" and threatened to "call the governor's office." *Id.*

11

About ten minutes later, Prospero placed a third call – this time directly to the 911 Center, by dialing 911 – again complaining of shooting sounds which she claimed violated the "noise ordinance." *Docs. 54-5, 54-6.* During this third call, Archibald told Prospero that he had spoken to a deputy about the issue. *Id.* Archibald repeatedly informed Prospero that the sounds were coming from a hunting club on private property. *Id.* Prospero continued to argue with Archibald about the legality of the shooting. *Id.* Archibald asked Prospero three times during the call if she would like contact with a deputy regarding her complaint, but Prospero refused. *Id.* Instead, Prospero continually demanded that the shooting be stopped. *Id.* Archibald believed that Prospero was calling about a non-emergency noise complaint – and not any type of safety issue[8] – and that Prospero was being purposefully disruptive and harassing

_____

[8] Prospero concedes that when calling the 911 Center about gunshots, it is important to make clear whether she is reporting a noise issue from the sound of shots (a non-emergency issue) or whether she is reporting a safety threat related to the shooting (an emergency issue). *Doc. 130,* 8:6-14; 23:2-10. For example, in May 2012, Prospero called 911 and specifically voiced complaints about projectiles or bullets "whizzing past" her house to convey a safety concern: "I remember saying that there were bullets coming or something to that effect, that bullets were coming by the house on one of the calls." *Id.*, 19:20-25, 20:1-25, 21:1; *see also Doc. 127,* 48:1-25, 49:1-25; *Doc. 127-6*, p. 42. Prospero acknowledged that on this occasion it was important for her to make clear to the 911 Center that she was "scared for [her] safety." *Doc. 130,* 21:2-5; *Doc. 127,* 49:1-25. In the calls at issue in this case, Prospero made no such explicit safety concern known to the dispatchers, who instead perceived the calls as simply voicing a noise complaint, which explains why the dispatchers did not relay any safety concern to the deputies. In addition, Prospero admits that if she was having a safety concern, she would want contact from

12

to the 911 Center. *Doc. 134*, 37:20-25, 38:1-5, 39: 1-18, 40:25, 41:1-3.[9]

Given the argumentative nature of this third call, Archibald transferred the call to his supervisor, Flowers. *Docs. 54-5, 54-6.* Flowers reiterated to Prospero that the shots were coming from private property in an unincorporated area of the County and that the shooting was lawful. *Id.* Flowers, like Archibald, believed that Prospero was calling about a noise complaint – as Prospero had done many times before – and not a safety issue. *Doc. 137*, 21:7-22, 22, 60:12-16, 74:23-24, 75:5-7, 95:10-22, 96:6-25, 97:1-5, 149-152, 153:11-25, 155:1-25, 156:1-25, 158:5-7, 171:17-25, 172:2-3. Prospero argued with Flowers and threatened on two occasions to call the "TV station."[10] *Docs. 54-5, 54-6.* Flowers also believed that Prospero was being purposefully disruptive and harassing to the 911 Center to affect her desired result

---

deputies. *Doc. 127,* 204:16-25. However, in the calls at issue in this case, Prospero repeatedly refused contact from deputies.

[9] Prospero also believed that she was calling about a non-emergency issue; She called the non-emergency number twice before calling 911 regarding the same complaint. This is consistent with Prospero's self-described misuse of 911: Prospero admits that she would call 911 for something that she felt was important, "even it it's not a true emergency." *Doc. 127,* 136:20-25, 137:1-8.

[10] Prospero believes that telling someone that she will go "higher up" or that she will contact the media, the press, or the TV stations is sometimes an effective way to get the result she desires. *Doc. 130*, 32:3-25, 33:1-5. When asked why she believes that this tactic is effective, Prospero unabashedly explained, "[s]ometimes it works." *Id.*, 33:6-8.

of getting the shooting noise to stop. *Doc. 137*, 164:3-5, 165:1-3, 167:18-25, 168:1. Prospero even admits that she was motivated, at least in part, to call the 911 Center because "[she] didn't want to be disturbed. [She] didn't want to be bothered by all the firing." *Doc. 129*, 314:15-25, 315:1-18.

Sullivan responded to Prospero's residence less than fifteen minutes after the third call. Prospero refused to answer the door, and Sullivan then requested that the 911 Center attempt to contact Prospero on the phone she had used to call the 911 Center. *Doc. 136-6, 136-11.* Prospero did not answer two attempted calls from the 911 Center. *Id.* Sullivan heard no gunshot noise while he was at the residence. *Doc. 149-2; Doc. 136-6.* Sullivan believes he then went to the property where the shooting was occurring, owned by Robert Paulk ("Paulk"), but the gate to the property was closed. *Id.*, 111:7-18. Paulk subsequently confirmed that his shooting that day was done legally, safely, and briefly on a shooting range on his own property. *Doc.167.*

After leaving Prospero's residence, and "before concluding [his] investigation, [Sullivan] went to dispatch to pick up the CADs[.]" *Doc. 136,* 125:20-25, 126:1-6. Sullivan was advised by dispatch that Prospero "was intentionally being disruptive to dispatch to get the services that she wanted in a faster response time." *Id.; see also Doc. 136,* 127:18-25, 128:1,136:25, 137:1-2. Sullivan was told by the dispatchers that they "felt like they were disrupted, and that the purpose of her call

14

was to interfere with their job duties in order to have the results she wanted at a faster pace than what she was getting." *Id.,* 193:1-4. Prospero does not dispute that the dispatchers reported to Sullivan that Prospero's calls were disruptive. *Doc. 127*, 250:1-7.

Sullivan then swore out an arrest-warrant affidavit ("Affidavit") against Prospero for the misdemeanor offense of violating O.C.G.A. § 16-11-39.2 by contacting the 911 Center, "an emergency telephone service[,] in reference to an incident that was not a true emergency for the purpose of interfering or disrupting an emergency telephone service." *Doc. 23-7.* This statute is not limited in scope to calls made directly to 911, but rather covers any "[c]alls" – defined broadly as "any communication, message, signal, or transmission"[11] – and other "contacts" with 911. As explained by the district court, "the [Sheriff's Office] and the 911 Center had every reason to believe that Prospero's non-stop complaints were most often not of an emergency nature and were instead unwarranted and not redressable." *Doc. 234*, p. 12.

Prospero claims that there was misinformation or omitted information in the Affidavit that caused the magistrate judge to issue the arrest warrant. A declaration from magistrate judge Jennifer Lewis ("Judge Lewis") refutes Prospero's theory that

---

[11] *See* O.C.G.A. § 16-11-39.2 (a)(1)(*citing* O.C.G.A. § 46-5-122(2.1).

Sullivan's Affidavit was potentially misleading or confusing to her. *Doc. 165*. In fact, Judge Lewis avers that she would have reached the same conclusion about the existence of probable cause, and would still have issued the warrant, even if the Affidavit were written exactly as Prospero claims it should have been. *Id.* Judge Lewis, after listening to Prospero's three calls to the 911 Center, confirmed her assessment that Prospero was reporting a non-emergency noise complaint and was purposefully disruptive to the 911 Center. *Id.*

Prospero was arrested on the misdemeanor charge in January 2019 after she was spotted in public by a deputy who knew Prospero had an outstanding warrant. The charge was eventually dismissed.

## II.    Course of Proceedings

Prospero filed suit against Sullivan, Prescott, and Jane and John Does on October 15, 2020, alleging First Amendment retaliation, Fourth Amendment unlawful arrest and malicious prosecution, and intentional infliction of emotional distress. *Doc. 1*. She subsequently amended her complaint three times. *Docs. 18, 45, 110*. In her second amended complaint, Prospero added Sheriff Proctor as a named defendant and added a claim for negligent hiring and retention against him. *Doc. 45*. Following the district court's order granting in part and denying in part Appellants' motion to dismiss, Prospero's claims for First Amendment retaliation, malicious

16

prosecution in violation of the Fourth Amendment, intentional infliction of emotional distress, and negligent hiring remained. *Doc. 66.* Prospero subsequently voluntarily abandoned her claim for intentional infliction of emotional distress. *Doc. 112*, pp. 3-4.

After discovery, Prospero moved for partial summary judgment on probable cause and malicious prosecution. *Doc. 149*. Appellants and Sheriff Proctor moved for summary judgment on all claims. *Doc. 171*. The district court denied Prospero's motion and granted Appellants' motion for summary judgment as to Prospero's First Amendment claim against Prescott and as to Prospero's negligent hiring claim against Sheriff Proctor. *Doc. 234*, pp. 86-87. The district court denied Appellants' motion for summary judgment regarding Prospero's Fourth Amendment malicious prosecution claim against Sullivan and Prescott, and with regard to Prospero's First Amendment retaliation claim against Sullivan. *Id.* It is the denial of summary judgment on those claims that Appellants challenge herein.

## III.    Standard of Review

This Court reviews de novo the district court's order denying summary judgment and concluding that Appellants are not entitled to qualified immunity. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

## SUMMARY OF THE ARGUMENT

To evaluate whether Appellants had arguable probable cause to seek Prospero's arrest and are thus entitled to qualified immunity, the trial court employed a standard announced by this Court in 2020 and considered only the information that was included by Appellant Sullivan in his Affidavit. But when the events underlying this case occurred in 2019, it was not clearly established that information known to an investigating officer, but not communicated to a judge, cannot be considered for purposes of evaluating arguable probable cause. The court thus erred by failing to take such evidence into consideration. The court further erred because the 2020 case, whose framework the court relied upon, requires a separate analysis of whether an arrest underlying a claim for malicious prosecution would have been justified as a warrantless arrest. The court failed to undertake this analysis.

Had the court evaluated all information known to Appellant Sullivan, including that imputed to him under the collective knowledge doctrine, the court would have reached the conclusion that Sullivan had ample probable cause to seek a warrant for Prospero's arrest. In particular, it is undisputed that a 911 dispatcher, on whom Sullivan was entitled to rely, told Sullivan during his investigation that Prospero intentionally disrupted the 911 Center. At a minimum, it was not clearly established at the time that Sullivan would violate Prospero's Fourth Amendment

18

rights by arresting her after this and other information was told to him or imputed to him under the collective knowledge doctrine.

Even under the improperly narrow analytical framework the trial court employed, Appellants were entitled to qualified immunity. The lower court identified four purported misrepresentations and two purported omissions in Sullivan's Affidavit and held that a jury question on the issue of arguable probable cause was presented. But the statements identified by the court are not misrepresentations or material omissions – let alone the type of intentional ones that are sufficient to defeat qualified immunity.

Finally, the district court erred in allowing Prospero's alleged subjective intentions behind the communication at issue to overcome Sullivan's qualified immunity on Prospero's First Amendment claim. The law is clear that the pertinent question is whether any reasonable officer in Sullivan's shoes could have perceived Prospero's speech as unprotected speech.  In other words, Prospero's claimed subjective intention or motivation for making the calls was improperly permitted to enter into the analysis and defeat qualified immunity.

## ARGUMENT AND CITATION OF AUTHORITY

I.    **The district court applied an improper qualified-immunity standard.**

   A.    ***The district court applied a standard that was first clearly established in 2020 to this case involving a 2019 arrest, and thus denied qualified immunity based on law that was not clearly established at the time of the actions at issue.***

The district court held that "the determination of probable cause depends on 'what the affidavit charging the plaintiff stated.'[Cit.]" *Doc. 234*, p. 63 (*quoting Williams v. Aguirre*, 965 F.3d 1147, 1163 (11th Cir. 2020)). Under this analysis, information Sullivan knew (and did not include in the Affidavit), and information or knowledge possessed by other officers or dispatchers (and imputed to Sullivan under the collective knowledge doctrine), are ignored in evaluating whether probable cause existed. Appellants do not dispute that *Williams* establishes that, in evaluating probable-cause issues, courts should look solely to the information contained in the arrest-warrant application.   However, the *Williams* opinion was issued in 2020, well after the events giving rise to this case. As this Court recognized in *Williams*, the law on this issue was not clearly established prior to that case.

In *Williams*, this Court recognized that it was resolving conflicting precedent on the issue of whether the probable-cause analysis in a warrant case is limited to an evaluation of the facts before the magistrate or goes further to include the facts and circumstances within the arresting officer's knowledge. This Court recognized an

inconsistency in its malicious-prosecution case law concerning "what information is relevant when determining whether probable cause exists for a seizure pursuant to legal process." *Id.* One line of cases held that the question turns on "whether probable cause existed from 'the facts that were before the magistrate' who issued the arrest warrant" – in other words, on what was actually communicated to the judge. *Id.* A second line of cases held instead that the relevant inquiry is into "the facts and circumstances within the [arresting] officer's knowledge" – regardless of whether they were communicated to the judge or not. *Id.*

When the events at issue occurred, it was not clearly established that the probable-cause analysis must be limited to the facts that were communicated to the magistrate judge. The district court erred when it imposed this restriction on the probable-cause and qualified-immunity (arguable-probable-cause) analysis in this case. *See Kinnemore v. Cochran,* 4:19-CV-00281-WMR, 2021 WL 1711563, at *6 (N.D. Ga. Mar. 24, 2021), *aff'd,* 21-11360, 2021 WL 5356281 (11th Cir. Nov. 17, 2021) (holding that, because the *Williams* decision was issued after the defendant's warrant application was submitted in 2017, the defendant "would not have violated clearly established law by relying on those earlier cases stating that the relevant information for a probable cause determination is what is available to the arresting officer himself[,]" and concluding that even though defendant did not include all of his knowledge about the plaintiff's past conduct in the application, that knowledge

21

should have been considered for the arguable probable-cause analysis). Application of an improper qualified-immunity standard is, alone, reversible error – and here, as will be shown below, application of the correct standard leaves no question that Appellants should have been granted qualified immunity. *See Garcia v. Casey*, 75 F.4th 1176, 1187 (11th Cir. 2023) (reversing trial court's denial of summary judgment after holding that trial court "applied the wrong legal standard to assess qualified immunity" in Fourth Amendment case and finding under correct standard that arguable probable cause existed).

**B.    The district court further erred by failing to conduct a separate probable-cause analysis to determine whether the arrest would have been justified without legal process.**

One part of the *Williams* opinion quoted by the district court is applicable here: to prevail on her Fourth Amendment malicious prosecution claim, Prospero must show clearly established law demonstrating that the "seizure would not otherwise be justified without legal process." *Doc. 234*, pp. 57-58. This inquiry "turns on whether the arresting officer had probable cause." *Doc. 234*, p. 66 (*quoting Williams v. Aguirre*, 965 F.3d at 1162). Despite citing this standard, though, the court failed to apply it.

*Williams* explains that "[t]he analysis of whether seizures pursuant to legal process violate the Fourth Amendment is distinct from the analysis of seizures without legal process." *Williams*, 965 F.3d at 1162. That is, "warrantless arrests

22

concern whether the facts known to the arresting officer establish probable cause, while seizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause." *Id*.[12]

It was vitally important for the district court to undertake this distinct probable-cause analysis because Prospero relies heavily on the contents of the Affidavit to overcome qualified immunity. Instead of undertaking a separate legal analysis that did not focus on the information presented to Judge Lewis, though, the court simply adopted its analysis of whether the judicial officer who approved the seizure had sufficient information to find probable cause: "And again, due to the factual disputes in this case, a jury must determine whether probable cause or arguable probable cause existed." *Doc. 234*, p. 73. However, the alleged factual disputes about what was included in or omitted from the Affidavit are immaterial to whether Sullivan had sufficient information and knowledge for arguable probable cause to charge Prospero *without* a warrant. It was clear legal error for the court not to undertake a separate analysis.

When evaluating Prospero's malicious prosecution claim, the district court tightly constrained the information to be considered in its probable cause analysis:

> Before entering the realm of probable cause, however, the Court must first clarify what information may be considered in evaluating the constitutionally infirm warrant requirement. The Court must consider only (1) the

---

[12] As discussed *supra*, the latter standard was not established until 2020.

> information before the magistrate judge who issued the
> warrant, minus (2) any material misstatements the officer
> might have made, plus (3) any material information that
> the officer omitted from the warrant affidavit. [Cit.]. The
> Court will not rely on 'information in an officer's
> investigative file or mind absent a 'record . . . that he
> submitted the file to or explained his thought processes to
> the magistrate judge.'[Cit.].

*Doc. 234*, p. 62. The district court adopted and incorporated this confined framework of probable cause that focuses entirely on the information presented in the Affidavit in evaluating the distinct issue of whether a reasonable officer under the circumstances would believe arguable probable cause existed for the charged offense without legal process. Prospero's allegations concerning misrepresentations or omissions in the Affidavit should not have entered this analysis. It is clear if the court disregarded the Affidavit and evaluated the information known to Sullivan (or imputed to him), including the fact that the dispatchers believed that Prospero was purposefully disruptive, qualified immunity would apply. For this second and independently sufficient reason, the district court's arguable-probable-cause analysis is fatally flawed.

## II. Had the district court applied the correct qualified immunity standard, it would have been constrained to conclude that the Affidavit was supported by at least arguable probable cause.

The district court failed to apply the correct legal standard to its arguable-probable-cause analysis for qualified-immunity purposes. Both of Prospero's remaining claims – brought pursuant to the First Amendment and the Fourth

24

Amendment – are entirely disposed of when the correct analysis is employed. *See Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) ("[W]hen an officer has arguable probable cause to arrest, he is entitled to qualified immunity both from Fourth Amendment claims for false arrest and from First Amendment claims stemming from the arrest.").

### A. The information known to Sullivan, including by way of the collective knowledge doctrine, amply demonstrated that there was arguable probable cause to seek Prospero's arrest.

The collective knowledge doctrine holds that probable cause can be established by the collective knowledge of communicating officers, rather than the sole knowledge of the individual officer taking action. *See Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) ("Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense."). *See also United States v. Wehrle*, No. CR406–333, 2007 WL 521882 at *3 (S.D. Ga. Feb. 14, 2007) (holding that information known to the civilian 911 dispatcher could be imputed to the police officer). The district court in *Wehrle* recognized that at the time of the decision, "the Eleventh Circuit ha[d] not decided whether the information possessed by a 911 operator/dispatcher is considered part of the collective knowledge of officers responding to a scene," but noted that "the majority of circuits

that have addressed the issue have held that it is. [Cits.]" *Id.* In 2019 – after the events at issue here – another court in Georgia readdressed the collective knowledge doctrine in a case involving 911 dispatchers. In *Gay v. Cobb County, Georgia*, No. 1:16-cv-025392019 at n. 4, 2109 WL 5530893 (N.D. Ga. Oct. 25, 2019), the court reaffirmed that "[t]he Eleventh Circuit has not decided whether a 911 operator's knowledge is within the collective knowledge of officers responding to a scene." However, the court concluded that "[t]he Eleventh Circuit would likely include it here because the information [from the 911 dispatcher] was inherently reliable."

The following information known to Sullivan or imputed to him via the collective knowledge doctrine, but not included in the Affidavit, should have been considered by the district court:

- Prospero's extensive history of contacting law enforcement to complain about gunshot noises in the same location. *Doc. 137*, 54:22-24, 162:1-14, 47:1-4, 52:19-24, 55:14-18; *Doc. 135*, 25:18-23; 28-58; *Doc. 135-4.*

- The Sheriff's Office and Prescott had repeatedly investigated the gunfire reported by Prospero and had repeatedly concluded that the gunfire was legal, safe and non-redressable. *Doc. 135*, 25:18-23; 28-58; *Doc. 135-4.*

- Flowers and Archibald both believed Prospero was purposefully disruptive in her calls with the 911 Center. *See Doc. 134*, 37:20-25, 38:1-25, 39: 1-18, 41:7-10, 49:19-20, 60:5-19, 61:15-17, 93:2-25, 94:14-17, 95:1-2, 103:13-25, 104:1-6; *Doc. 134-1* (errata sheet); *Doc. 137*, 21:2-22, 60:12-16, 74:23-24, 75:5-7, 95:10-22, 96:6-13, 96:22-25, 97:1-5, 149-153, 156:18-25, 158:5-7, 164:3-5, 165:1-3, 167:18-25, 168:1, 171:17-25, 172:2-3.

- Flowers told Sullivan that Prospero was being purposefully disruptive during the calls.[13] *Doc. 228*, ¶5; *Doc. 136,* 192:25, 193:1-10.

- Prospero's history of threatening dispatchers with going to the media or the Governor to try to coerce them into giving her the results she wanted.  *Doc. 127-12,* p. 8; *Doc. 130,* 32:3-25, 33:1-8.

- Prospero's extensive history of contacting law enforcement to complain about non-emergency, personal grievances. *Doc. 127,* 40:13–16, 33:16–25, 34:1-20 29:22, 176:1, 121-125, 135, 141-142;  *Docs*. *127-2, 126-6, 127-7, 127-8, 127-10, 127-12, 127-14, 127-15, 127-16, 127-17, 127-18.*

The district court was required to consider all of this information in evaluating whether Sullivan had arguable probable cause, but it did not. Probable cause for the charged offense would certainly exist if this information were considered. At a minimum, arguable probable cause would exist in that it cannot be said that no reasonable officer possessing this information (including that the dispatchers thought that Prospero's calls were purposefully disruptive) would believe probable cause existed.

Courts in this Circuit have routinely found arguable probable cause in similar cases based on the same type of evidence. *Al-Hakim v. Roberts*, No. 8:08–cv–01370, 2009 WL 2147062 (M.D. Fla. Jul. 13, 2009), is analogous. In *Al-Hakim*, the plaintiff was arrested after he called 911 twice to speak with a captain or supervisor about a

---

[13] Again, this information should have been accepted as true by the district court even without applying the collective knowledge doctrine because Flowers and Sullivan both testified that this conversation occurred.

police officer who had investigated an incident at the plaintiff's residence. *Id.* at 2. After the first 911 call, the officer and his supervisor were dispatched to the plaintiff's residence. Upon the supervisor's arrival, the plaintiff stated he did not want to speak with the supervisor and proceeded to call 911 for a second time. When asked why he was calling 911, the plaintiff stated he wanted a captain to come to his house. The plaintiff was arrested under Florida law for misuse of 911. The plaintiff then filed suit alleging claims under 42 U.S.C. § 1983 against the officers for false arrest, abuse of process, and malicious prosecution. *Id.* The district court granted summary judgment in favor of the officers, holding that the officers "had sufficient actual and arguable probable cause to conduct an arrest for Misuse of 911." *Id.* at 6. The district court made clear that not only was the arrest supported by arguable probable cause, but no constitutional violation had occurred as the arrest was supported by actual probable cause. *Id.* at 7.

*Scott v. Escambia County Sheriff's Office*, 3:19-CV-03539-RV-HTC, 2019 WL 6831447 (N.D. Fla. Oct. 28, 2019), is a more recent case involving a false arrest claim made after the plaintiff was arrested for misuse of 911. In *Scott*, the plaintiff called 911 to report his loss of $227.00, which he alleged was stolen from him. Officer Kearns responded to the scene, but plaintiff refused to provide his contact

information and, therefore, the officer refused to file a report of the complaint. The plaintiff then called 911 at least 5 times before being arrested pursuant to a warrant.[14]

The court ultimately held that the fact that a circuit court judge determined probable cause to exist was conclusive evidence that probable cause existed for the charge. *Id.* at 3. Further, the court held that "[g]iven the number of times [the] [p]laintiff called 911, the fact that the [p]laintiff was warned not to call 911 again, and that there was, indeed, no emergency, reasonable officers in the same circumstances as Defendants could have believed there was probable cause to arrest Plaintiff." *Id.*  In the present case, the 911 statute provides a much lower threshold to charge an offense as compared to the Florida statute in *Scott*, requiring only that an offender purposefully disrupt or interfere with the emergency telephone service (as compared to requiring a showing of a *false* report). But like the plaintiff in *Scott*, Prospero in this action made multiple calls to an emergency service, was warned about doing so,[15] and "there was, indeed, no emergency."[16] Just as in *Scott*, qualified immunity should protect Appellants in this case.

---

[14] *Lampley v. Davis*, No. 3:10-CV-00711, 2010 WL 4105621 (N.D. Ohio Oct. 18, 2020) and *Taylor v. Taylor*, 649 F. App'x 737 (11th Cir. 2016) further demonstrate that Sullivan had arguable probable cause.

[15] *See Doc. 127,* 135-136; *Doc. 127-13; Doc. 133-2; Doc. 133*, 31:20-25, 32:1-5.

[16] *See generally Docs. 134* and *137* (Depositions of Archibald and Flowers).

**B.** **There are no material factual disputes that preclude a determination that *Sullivan* had arguable probable cause.**

The district court held that three factual disputes "prevent[ed] the Court from deciding whether Sullivan had probable cause." *Doc. 234*, pp. 50-51, p. 73. The court identified disputes about: (1) *how* Sullivan learned that the dispatchers believed Prospero was being disruptive or harassing,[17] (2) whether Sullivan knew that the property behind Prospero's home was a hunting club where shooting was lawful,[18] and (3) whether Sullivan "included material misstatements [and omissions] in his warrant affidavit and whether such misstatements were reckless or intentional[,]"[19].The first two issues are not actually disputes, and certainly are not *material* disputes. The latter purported dispute focuses on information in the Affidavit, and is thus irrelevant under the correct arguable-probable-cause framework.

> 1. *There is no dispute that Flowers told Sullivan, during Sullivan's investigation, that Flowers believed Prospero was being purposefully disruptive during her calls.*

The district court acknowledged that, during his investigation, Sullivan learned that Prospero was being disruptive and harassing during her calls. *Doc. 234*, p. 50. And the court acknowledged that Sullivan was told this information by

---

[17] *Id.*, 50.

[18] *Id.*

[19] *Id.*, 51.

30

Flowers. *Doc. 234*, p. 51 (citing Flowers' declaration [*Doc. 228*, ¶ 5] in which Flowers states, "I specifically recall telling Deputy Sullivan during the course of his investigation of the calls on Thanksgiving Day that I believed Prospero's calls and communications with the 911 Center that day were purposefully disruptive[.]").[20] Strangely, because Flowers could not remember whether this conversation took place in person, or by phone or radio,[21] the district court found a jury issue was created as to arguable probable cause. *Doc. 234,* p. 51. But there is no dispute about whether Sullivan was informed by Flowers that Prospero was purposefully disruptive during her calls, which is more than sufficient grounds for charging her with a misdemeanor under O.C.G.A. § 16-11-39.2(b)(2).[22]

At a minimum, it was not clearly established in 2018 that the dispatchers' knowledge about the calls – that Prospero was purposefully disruptive – is not imputed to Sullivan. As such, it does not matter *how* Flowers told Sullivan that Prospero was purposefully disruptive. This knowledge flows to Sullivan for qualified immunity purposes.

> 2. *There is no dispute that Sullivan reasonably believed the shooting was coming from a hunting club where shooting was lawful.*

---

[20] Prospero does not dispute that Flowers told Sullivan that her calls were intentionally disruptive. *Doc. 127*, 250:1-7.

[21] *See Doc. 228*, ¶ 6.

[22] Even if there were conflicting evidence regarding the location of this conversation, which there is not, it is undisputed that the conversation occurred.

The district court concluded that there is a factual dispute as to "whether Deputy Sullivan actually knew that the property behind [Prospero]'s home was a hunting club where shooting was legal and safe, or whether Sullivan simply assumed this fact without verification." *Doc. 234*, p. 50. But there is no evidence suggesting that Sullivan's averment of this belief was false or mistaken. And, even if the Affidavit contained a false assumption, it would not create a genuine issue of material fact unless there is evidence that Sullivan intentionally made this misrepresentation. There is no evidence that this statement was an intentional misrepresentation.

When, as here, an Affidavit establishes probable cause on its face, there can be no liability for a Fourth Amendment violation unless it is shown that the Affidavit contained intentionally and materially false statements or omissions. *See Hilmo v. Jackson*, 22-13015, 2023 WL 4145495 (11th Cir. June 23, 2023). Here, there is nothing to indicate that the statement at issue was false. Sullivan testified that when he told the dispatcher that he was familiar with who was shooting, he was referencing Paulk. *Doc. 136,*40:2-5, 42:1-14,47:13-16. Sullivan knew that Paulk owned property in the area and that the shots would have been coming from his property. Sullivan was "familiar with him shooting in the area" and "had reason to believe that it was Robert Paulk or his family members firing at their gun range." *Id.,* 40:15-17, 65:4-6. Sullivan believed that the shots "were coming from Mr. Paulk's range, which is

well away from Satilla Bluff Road West" and "were being fired in a safe manner." *Id.,* 65:22-24; 68:1-2. Sullivan testified, "I was confident in knowing where the location of the shots being fired were coming from." *Id.,* 217:18-19. Sullivan understood that Paulk's shooting range posed no danger to residents on the other side of the lake. *Id.*, 66-69. *See also Doc. 168.*[23]

The district court disregarded the declaration of Paulk that confirmed that he was shooting on his property on the afternoon in question, and that the shooting was safe and lawful. *See Doc. 167*. Significantly, Prospero does not dispute that Sullivan knew where the shooting was coming from. *Doc. 127,* 190:16-23. Accordingly, there is no evidence that any "assumption" by Sullivan as to the location of the shooting noise was false – let alone intentionally (or even recklessly) so.

Moreover, it is not clearly established that an officer's probable-cause analysis is invalidated if it contains a personal assumption. To the contrary, a personal assumption included in a Affidavit is "at worse, negligent." *United States v. Railey*, 481 Fed. Appx. 545, 548 (11th Cir. 2012). "Negligent or innocent mistakes in a warrant application support no Fourth Amendment constitutional claim." *Fleming v. Barber*, 383 F. App'x 894, 897 (11th Cir. 2010). Probable cause may be founded upon information within the affiant's own knowledge, which is considered "truthful" for purposes of evaluating probable cause so long as the "information put forth is

---

[23] Prescott had this same knowledge. *Doc. 169*.

believed or appropriately accepted by the affiant as true." *Kelly v. Curtis*, 21 F.3d at 1554-55 (11th Cir. 1994) *quoting Franks v. Delaware*, 438 U.S. 154, 165-66, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). In short, even if Sullivan's statement that the shooting was safely coming from a hunting club was based on an assumption, that statement was not false and no issue of material fact arises.

III.  **Even under an improper qualified-immunity standard focusing solely on the contents of the Affidavit, the trial court erred in holding that the Affidavit did not establish arguable probable cause.**

The law was well established at the time the Affidavit was submitted that only a showing of intentional (not reckless) material misstatements or omissions could overcome the protections of qualified immunity. Notably, in ruling on Appellants' motion to dismiss earlier in the case, the district court recognized the correct legal principle:

> And the qualified immunity defense adds another wrinkle. Unlike the baseline question of a Fourth Amendment violation, false statements and omissions must be intentional – not merely reckless—to negate qualified immunity. *Carter*, 557 F. App'x at 908 (*citing Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994)). The reason for that is 'the blurry line between reckless misstatements, which violate [the Fourth Amendment], and negligent misstatements, which do not[.]' *Id.* That vague line is a problem for the 'clearly established' inquiry, rendering the law 'insufficiently clear to defeat qualified immunity.' *Id.*; *cf. Johnson v. Shannon*, 484 F. Supp. 3d 1344 (N.D. Ga. Aug. 28, 2020).

*Doc. 66,* p. 22. After setting forth the correct qualified immunity standard in its ruling on Appellants' motion to dismiss, however, the district court went on to apply a different standard to Appellants' motion for summary judgment. The district court

34

improperly held that questions of fact as to whether the Affidavit contained reckless (but not necessarily intentional) misrepresentations and omissions were sufficient to overcome qualified immunity. Specifically, the district court held that Appellants were not entitled to qualified immunity on Prospero's malicious prosecution claim "[b]ecause [Prospero] presents a genuine dispute of fact as to whether Defendants 'intentionally *or recklessly* made misstatements' in the warrant application[.]" *Doc. 234,* p. 75. (emphasis supplied).

In *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994), this Court acknowledged that qualified immunity protects an officer from allegations of recklessly false statements or omissions because "the difference between 'reckless' and merely 'negligent' disregard for the truth is not crystal clear; [the Eleventh Circuit has] not staked out a bright line." *Id.,* at 1554. This qualified-immunity standard was reaffirmed in *Carter v. Gore*, 557 Fed. Appx. 904 (11th Cir. 2014), wherein this Court recognized:

> An officer loses qualified immunity if the plaintiff can prove that the officer perjured himself – that is, put forth information he did not believe or accept as true – in order to obtain a search warrant. An officer does not lose qualified immunity, however, if all the plaintiff can prove is that the officer made recklessly false statements in order to obtain a search warrant.

35

*Id.,* at 908 (*citing Kelly*, 21 F.3d at 1554) (citations omitted). *See also Johnson v. Shannon*, 484 F. Supp.3d 1344, 1352 (N.D. Ga. 2020).[24] The district court erred when it applied a standard that focused solely on the contents on the Affidavit, but even under that standard, Appellants would have been entitled to qualified immunity had the court properly analyzed whether any of the alleged misrepresentations and omissions in the Affidavit is a type that has been clearly established to rise to the level of intentional.

The district court also erred, even within the confines of an already improper analytical framework, in its evaluation of whether the alleged misrepresentations and omissions were material or "necessary" for the Affidavit to prove probable cause. *See Jones v. Cannon*, 174 F.3d 1271, 1285–86 (11th Cir. 1999). To evaluate materiality, a plaintiff must first explain how any inaccuracies were material, *i.e.*, "necessary to support the warrant." *Luke v. Gulley*, 50 F.4th 90, 95-96 (11th Cir. 2022). If the Affidavit still manages to establish probable cause for the crime charged even after correcting the defendant's purported lies, misleading statements, and

---

[24] The reasoning for requiring intentional conduct to defeat qualified immunity in a case alleging misrepresentations/omissions in an arrest warrant application remains today because the line between negligent and reckless conduct has still not been clearly defined. *See Hilmo v. Jackson,* No. 22-13015, 2023 WL 4145495, at *3 (11th Cir. June 23, 2023). Even if there was a clear line distinguishing between negligent and reckless conduct, Prospero does not point to any decision of this Court or the Supreme Court that clearly establishes that the sort of conduct alleged here is reckless rather than negligent.

omissions, then that misconduct did not cause the plaintiff any harm. *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). And, if the corrected Affidavit "would have demonstrated even arguable probable cause – that a reasonable officer could have believed an offense was committed – then the officers are entitled to qualified immunity." *Id.,* at 1288. The district court devoted only a few sentences of its eighty-eight-page order to the issue of the materiality of the alleged misrepresentations and omissions, holding that "[a] jury must determine" whether "any of the misstatements or omissions in the Affidavit could have negated probable cause[.]" *Doc. 234,* p. 54.

The district court identified four alleged misrepresentations and two omissions that a jury might consider "reckless or intentional" and material. *See Doc. 234,* pp. 51-54. Even assuming that the identified passages in the Affidavit amount to misrepresentations or omissions, there is no evidence that they are either intentional or material.

### A. *The time period listed in the Affidavit was not a material, intentional (or even reckless) misrepresentation.*

First, the court addressed Prospero's argument that the Affidavit indicated that the 911 call lasted thirty-two minutes – from 2:58-3:30 p.m. – when, in reality, the call was two and a half minutes long. *Id.,* 51-52. The non-narrative portion of the Affidavit states that Prospero committed "Unlawful Conduct during [a] 911 Call on November 22, 2018 at 02:58 PM to November 22, 2018 at 03:30 PM." *See Doc. 149-30.* As Sullivan explained: "That time would reflect the time that I received the

37

call for service for the 911 call and responded to her residence . . . it's not showing that she was on the phone at 2:58 until 3:30." *Doc. 136,* 182:15–19. Sullivan believed that the time entry prompt in the computerized Affidavit generator was to indicate "[t]he entire duration of my involvement" with the call and not simply the duration of the call.[25] *Id.,* 182-184. Likewise, Prescott also testified that he views the time to represent "the total call for service" and not the duration of the third call. *Doc. 135*, 127:24-25, 128:1-9. There is nothing in the record to suggest that this time entry was an intentional misrepresentation aimed at deceiving the magistrate judge. This is especially apparent because Sullivan included information in the Affidavit that indicated that Prospero was *not* on the phone with 911 during the 32-minute period of his call for service. The Affidavit states:

> I knocked on the front door of the residence in an attempt to make contact with Ms. Prospero but met negative results two separate times. *I asked the Camden County Emergency Dispatch Center to contact Ms. Prospero's phone number that was used to call 9-1-1 but they stated the phone went to voicemail both times they attempted calling. Contact was never made with Ms. Prospero while on scene at her residence.*

*Doc. 149-30* (emphasis supplied). As Sullivan explained:

> I put in the narrative that I asked them to contact her back using the number she called. So when the judge reads the narrative, they wouldn't have been able to think or assume that they were still on the phone with her if they were trying to call her back.

---

[25] It is undisputed that Sullivan's call for service pertaining to the 911 call concluded when he left Prospero's residence at approximately 3:30 pm. *Doc. 136*, 110:6-8.

*Doc. 136,* 189:19-25. Sullivan's entry regarding the duration of the call is not a misstatement at all, and even if it were, it could not be said to be anything more than negligent.

The time in the header of the Affidavit is also immaterial. Judge Lewis, who signed the arrest warrant, provided an unrefuted declaration that the time period was not confusing to her and that she "understood from the remaining narrative section of [Sullivan's] affidavit that [Prospero] was not on the third call for 32 minutes." *Doc. 165,* ¶ 7. Judge Lewis "understood that this time period included Sullivan's response to the third call." *Id.* According to Judge Lewis, if Sullivan had included in the Affidavit the exact length of the third call, it would have changed nothing. *Id.* Judge Lewis's declaration is important evidence that was not even mentioned in the district court's order.

Further indicating the immateriality of the duration of the third call is that the length of the call is irrelevant to the charged offense. Prospero was charged with violating O.C.G.A. § 16-11-39.2(b)(2), which prohibits "annoying, harassing, or molesting a 9-1-1 communications officer" or calling "for the purpose of interfering with or disrupting emergency telephone service[.]" She was not charged under O.C.G.A. § 16-11-39.2 (b)(3), which prohibits failing "to hang up or disengage the connection [with 911] for the intended purpose of interfering with or disrupting emergency service." Sullivan testified that he did not consider the duration of the

third call important to the charge and noted that "you could have the same offense with someone who continuously calls 911 and hangs up without any duration" and "without any contact on the phone." *Doc. 136*, 191:17-23, 192:11-14.

### B.   The statement that Prospero hung up the phone after refusing to give the dispatchers further information was neither a misrepresentation nor material.

Sullivan wrote in the Affidavit that, as to the first call, Prospero hung up the phone and refused to give the dispatchers further information, which Prospero claimed was "misleading." *Doc. 234*, p. 52. But that is exactly what happened. Prospero told the dispatcher in this very short call: "I don't want to give my information. I'm not the one shooting. I just want the shooting to stop. I'm trying to enjoy my Thanksgiving." *Docs. 54-1, 54-2*. This statement was simply not a misrepresentation.

Even if the statement – "Ms. Prospero ended the phone call by hanging up after refusing to give any further information" – were a misrepresentation, it would be immaterial to the probable-cause analysis. First, the statement merely conveys that (1) the first call ended,[26] and (2) Prospero declined to give additional information.[27]   Nothing about the first call (other than that it occurred prior to

---

[26] Sullivan testified that his statement about Prospero "hanging up" was merely intended to indicate that she "ended the phone call." *Doc. 136,* 216:5-12.

[27] During the call, Prospero explicitly stated, "I don't want to give my information. I'm not the one shooting." *Doc. 55-2*, p. 3.

Prospero's next two calls about the same noise complaint) played a role in the charged offense. Taking away that Prospero hung up (which is evident in the Affidavit's details about the second and third calls) does not move the needle. Neither does removing the mention that Prospero did not want to provide additional information in the first call.

### C. *The statement that Prospero heard shots fired behind her residence in the area of the hunting club was neither a misrepresentation nor material.*

In the Affidavit, Sullivan stated that Prospero told the dispatchers that "she heard shots being fired from behind her residence in the area of the hunting club." *Doc. 149-30.* The district court reasoned that this statement could be interpreted to mean that Prospero knew that the area was a hunting club or could be construed to mean that Sullivan was simply describing the area. *Doc. 234,* p. 53. Maybe so, but this establishes, at most, that the statement was ambiguous. There remains no evidence to support the notion that this statement was somehow an intentional (or even reckless) material misrepresentation.

Sullivan testified that he was simply attempting to convey the area or location of the shots described by Prospero and was not attempting to convey that Prospero knew the shots were coming from a hunting club when she initially called. *Doc. 136,* 228-230. However, even if Sullivan were attempting to convey that Prospero knew the shots were coming from a hunting club, the evidence nevertheless supports this

41

fact. It is undisputed that the area behind the Chevron was "an informal hunting club" on "private property" where people hunt. *Id.* 228. Moreover, during the second call with Prospero, it was the dispatcher who initially used the term "hunting club" to describe the location of the shooting. *See Docs. 54-3, 54-4.* The dispatcher even documented in the CAD – which was relied upon by Sullivan in drafting the Affidavit – that he informed Prospero that the shooting was coming from "private property and on a hunting club." *See Doc. 134-3*; *Doc. 136*, 160-61. Thus, Prospero knew during the second call (and before the third call) that the shots were coming from behind her residence "in the area of the hunting club."[28] Prospero herself characterizes this alleged misrepresentation as reckless, arguing the point under the heading: "Reckless misrepresentations about Plaintiff's call to non-emergency line[.]" *Doc. 149,* p. 20. Again, this statement should not even be construed as reckless.

This statement is also not material to a finding of probable cause, especially considering the information contained in the subsequent paragraphs of the Affidavit that establishes that Prospero was told the shooting was lawfully occurring on private property. The paragraphs that follow the potentially ambiguous statement  provide

---

[28] Prospero admits that all three calls were made to address the same shooting noise coming from the "same general location." *Doc. 127*, 221-22. The district court noted that in response to Prospero's prior complaints about gunfire "from the same location . . . behind [the] Chevron gas station," the Sheriff's Office had previously "determined that this property was a hunting club." *Doc. 234*, p. 3.

additional information about the location of the shooting and Prospero's knowledge of the location of the shooting, including that: (1) Sullivan knew the shooting was on private property of a hunting club and lawful, (2) Sullivan advised the 911 Center of that information, (3) the dispatchers advised Prospero during the second call that the shooting was on private property and lawful, and (4) during the third call Prospero was told the shooting was lawfully occurring on private property. Removing the Affidavit's very first mention of the shooting's location would result in the statement reading that the caller advised that "she heard shots being fired from behind her residence ~~in the area of the hunting club~~." Because the Affidavit goes on to establish that the shooting was occurring on private property and was lawful, and that Prospero was informed of this fact on two of the three calls, removing this language is completely inconsequential to the probable cause analysis. *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). A reasonable officer could certainly still believe that the charged offense was committed without mention of these seven words at the beginning of the Affidavit.

### D.    The statement that Prospero called 911 in reference to an incident that was not a true emergency was neither a misrepresentation nor material.

Prospero's argument is that O.C.G.A. § 16-11-39.2 prohibits contacting 911 "for the purpose of interfering with or disrupting emergency telephone service," but does not prohibit or make it unlawful to contact 911 for non-emergency service. *Doc.*

43

*149,* p. 20. According to Prospero, "Sullivan recklessly deemed Plaintiff's request to stop the gunshots to be a 'non-emergency' and then falsely equated this to her having the intent to interfere with or disrupt 911."[29] *Id.* This is not a misrepresentation.

Beyond that, it cannot be said that it was a misrepresentation to say that Prospero was calling about something that was not a true emergency and, in so doing, violated O.C.G.A. § 16-11-39.2 by purposefully disrupting the 911 Center. Prospero had been warned by Sheriff Proctor to only call 911 for true emergencies and to use the non-emergency line for any other issues. *Docs. 127-13; 133-2; 133,* 31:20-25, 32:1-5. As evidence that Prospero was not calling about a true emergency, she voiced her complaints about the shooting noise in two calls to the non-emergency number *before* electing to call 911 about the same issue. This fact indicates Prospero understood she was calling about a non-emergency. Both dispatchers who spoke to Prospero during the calls believed that Prospero's calls

---

[29] Whether Prospero intended to disrupt the 911 Center is immaterial to the probable and arguable probable cause analysis. It has long been accepted that the intent element of a criminal statute need not be satisfied to establish probable cause. *See, e.g., United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983); *Jordan v. Mosley*, 487 F.3d 1350, 1356 (11th Cir.2007) (This "Circuit has concluded that, even for a criminal statute that requires proof of an intent to defraud for a conviction, an arresting officer does not need evidence of the intent for probable cause to arrest to exist[.]"); *Lee v. Ferraro,* 284 F.3d 1188, 1195 (11th Cir. 2002)("Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors. [Cit.]").

were about a non-emergency noise complaint – Prospero repeatedly references noise ordinances in the calls – and that she was intentionally disruptive to obtain her desired result of getting the shooting to stop. *See Doc. 134,* 37:20-25, 38:1-25, 39: 1-18, 41:7-10, 49:19-20, 60:5-19, 61:15-17, 93:2-25, 94:14-17, 95:1-2, 103:13-25, 104:1-6; *Doc. 134-1* (errata sheet); *Doc. 137*, 21:2-22, 60:12-16, 74:23-24, 75:5-7, 95:10-22, 96:6-13, 96:22-25, 97:1-5, 149-153, 156:18-25, 158:5-7, 164:3-5, 165:1-3, 167:18-25, 168:1, 171:17-25, 172:2-3.   This is why the CADs of the calls completed by Archibald – and relied upon by Sullivan – indicated that Prospero's calls were of a non-emergency nature. *See Docs. 134-3; 134-4; 134,* 49:19-20, 93:4, 101:23-25,102:1. Moreover, Judge Lewis agrees that the complaints "were not of an emergency nature or based on any apprehension or fear for safety but were instead an effort to get the shooting noise stopped." *Doc. 165*. It is undisputed that Sullivan was never informed that Prospero was calling about any safety or other emergency issue.[30]   Because the dispatchers and judge believed Prospero was repeatedly calling about a non-emergency matter, Sullivan's articulation of that same belief – based on information he received from the dispatchers – cannot have been an intentional misrepresentation.

---

[30] Prospero merely argues that *if* Sullivan had listened to the calls, he would have reached the conclusion that Prospero was calling about an emergency safety issue, even though no one else who has listened to the calls (including the dispatchers and the judge who issued the arrest warrant) believes that.

Assuming *arguendo* that this was a misrepresentation, it was not material. Removing this clause would cause the Affidavit to read: "For the said Emma Jane Prospero did violate O.C.G.A. 16-11-39.2 when he/she unlawfully contacted 911, an emergency telephone service ~~in reference to an incident that was not a true emergency~~ for the purpose of interfering or disrupting an emergency telephone service." The statement is contained in the header of the Affidavit where the charged offense is stated. The Affidavit then contains a 4-paragraph, 23-sentence detailed narrative supporting the charge that Prospero purposefully disrupted the 911 service by repeatedly calling about lawful shooting noise. In other words, the narrative section of the Affidavit makes abundantly clear that Prospero was calling about a non-emergency, non-redressable noise issue, so removing the initial mention that Prospero called about a non-emergency is immaterial.

### E. Prospero's statement that the shots were "too close," or that the shooting noise had been stopped in the past, was not a material, intentional (or even reckless) omission from the Affidavit.

The district court concluded that there is a dispute as to whether "Sullivan omitted exculpatory information that [Prospero] told the dispatchers that the shooting was too close to homes in her neighborhood and that law enforcement had previously stopped the shooting." *Doc. 234*, p. 54. First, it is undisputed that Sullivan was never informed of these statements, so it cannot be said that this should have

been included in the Affidavit.[31] Second, Prospero again merely argues that Sullivan

recklessly (and not intentionally) omitted this information, so that gets her nowhere.

*See Doc. 149,* p. 23. Prospero acknowledges that Sullivan had no knowledge of the

referenced statements that she claims were omitted from the Affidavit, titling her

argument: "<u>Reckless omission of exculpatory information Sullivan *should have*</u>

<u>known</u>[.]" *Id.* (emphasis in original).

    Moreover, inclusion of this information in the Affidavit would not have

changed the existence of arguable probable cause for the charged offense. Prospero's

own testimony undercuts her contention that her statements to the 911 Center

---

[31]Prospero argues that Appellants were required to listen to the audio recording of
each call and could not rely on the reporting about the calls from the dispatchers,
Appellants' own involvement in the calls, and the written record of the calls (the
CADs). This is incorrect. Appellants were not required to leave "every stone
unturned" in their investigation. *See e.g., Coward v. Simone*, No. 1:11-CV-00383,
2012 WL 4381270, at *7 (N.D. Ga. Sept. 24, 2012); *Mehta v. Foskey*, No. CV 510-
001–LGW, 2013 WL 1808764, at *2 (S.D. Ga. 2013). Moreover, information from
certified communication officers like Flowers is "inherently reliable." *See Gay v.
Cobb County, Ga.*, 2019 WL 5530893, at *5 n.4 (N.D. Ga. Oct. 25, 2019) (*citing
United States v. Wehrl*e, No. CR406-333, 2007 WL 521882, at *1 (S.D. Ga. Feb. 14,
2007)). This makes sense because, as explained by Appellants, they put their lives
on the line based on the information provided by the 911 Center. *Doc. 135*, 93:16-
25, 94:1-5, 98:18-25, 99:1-5; *Doc. 136*, 19-21,115:2-6, 152:6-9. If officers can rely
on information from confidential informants, *Washington v. Howard*, 25 F.4th 891,
902 (11th Cir. 2022), and feuding neighbors, *Taylor v. Taylor*, 649 F. App'x 737
(11th Cir. 2016), to establish probable cause, Appellants respectfully maintain that
there should be no debate about whether Sullivan can rely on "inherently reliable"
information from a 911 supervisor to establish probable cause (let alone arguable
probable cause).

regarding the closeness of the shots were material. Prospero was questioned about her statement to Archibald in the third call that, "It's too close to the neighborhood." *Doc. 54-6,* p. 3. Importantly, Prospero explained that the word "it's" referenced noise and not bullets. *Doc. 127*, 205:14-17. Prospero simply assumed (incorrectly) that if you could hear gunshots, it means that "there's bullets coming at you."[32] If Sullivan had included in the Affidavit that Prospero thought the *noise* from the shots was too close to the neighborhood or homes, nothing would have changed in the probable cause analysis.

Prospero knows that she did not specifically mention safety issues in any of her three calls: "*I don't know if we specifically mentioned on that*, but we were calling." *Doc. 128*, 315:2-7 (emphasis supplied). Prospero testified that she did not make clear to the dispatcher that she was concerned about the bullets from the shots because, "I was scared and I was nervous. I don't know. Maybe I didn't say the – when you hear that many shots, *I was scared and nervous, and I didn't think to say the right thing*, I guess. I don't know." *Id.*, 177:19-25 (emphasis supplied). It is unpersuasive for Prospero to argue that including her exact statements regarding the shots being "too close" in the Affidavit would have altered anything because: (1) Prospero admits that she was referring to noise from the shots, (2) Prospero admits

---

[32] This is a dubious claim given Prospero's lengthy history of calling to complain about gunshot noise with no mention that bullets were coming at her or that her safety was at risk.

that she "didn't think to say the right thing," (3) the dispatchers believed Prospero was referring to noise and not bullets, and (4) Judge Lewis confirmed that even if this information had been included in the Affidavit, it would not have changed her assessment that Prospero was not voicing complaints of "an emergency nature or based on apprehension or fear for safety[.]"[33]

As to the claim that Sullivan should have included in the Affidavit that Prospero told the dispatchers the shooting noise always had been stopped in the past, this is not a material omission. First, the statement is false. As the district court noted, prior to the incident, "[t]he Sheriff's Office repeatedly investigated the gunfire and repeatedly came to the same conclusion that the gunfire was legal and safe." *Doc. 234*, p. 3. In fact, the evidence indicates that on multiple occasions the Sheriff's Office investigated Prospero's shooting-noise complaints and informed the subjects of the complaints to continue shooting. *Id.,* 3-4. Second, even if Sullivan had included this information, it would not negate that arguable probable cause existed to believe that Prospero's repeated and argumentative calls on the day in question regarding lawful shooting noise were disruptive to the 911 Center.

---

[33] *Doc. 165*, ¶¶ 11-12.

**IV.    The district court erred when it held that Prospero's alleged subjective purpose or motivation behind making the calls created a genuine issue of material fact regarding whether her speech was protected by the First Amendment.**

When evaluating whether Prospero's calls constituted protected speech for purposes of her First Amendment retaliation claim, the district court improperly imposed a *mens rea* requirement, allowing Prospero's claim to overcome qualified immunity because Prospero claimed that her subjective intent or motivation for making the calls was for a protected purpose. *Doc. 234*, pp. 34-35. Specifically, the district court found a genuine issue of material fact regarding "whether Plaintiff was calling solely to harass or disrupt the 911 Center – making her speech unprotected – or whether Plaintiff was calling because she felt her safety was in jeopardy – making her speech protected." *Doc. 234,* pp. 43-44. The district court also found a genuine issue of material fact regarding whether Prospero's calls were motivated by what she perceived as instructions from the Sheriff's Office to call 911 every time she heard a gunshot. *Doc. 234*, pp. 44-45.

The district court erred in imposing a *mens rea* consideration to the arguable-probable-cause analysis. Even if satisfaction of the intent element of the crime were relevant for purposes of a probable cause analysis, which it is not, the court erred in evaluating the intent element from Prospero's perspective and not the view of a

reasonable officer.[34] That is, the district court should not have concluded that Prospero could create a jury issue on whether her speech was protected by claiming that her stated subjective intentions or motivations for making the calls were different than what the dispatchers, judge and a reasonable officer would believe.

"A government agent does not violate the First Amendment when his allegedly retaliatory action is motivated by a reasonable belief that the plaintiff engaged in a speech act that is not constitutionally protected." *Czapiewski v. Russell*, 15-CV-208-BBC, 2016 WL 3920503, at *1 (W.D. Wis. July 18, 2016). "As the Supreme Court has stated, in analyzing First Amendment retaliation claims, it is the defendant's motive, 'and in particular the facts as the [defendant] reasonably understood them,' that matter." *Id.* at *3 (W.D. Wis. July 18, 2016) *quoting Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 267, 136 S. Ct. 1412, 1414, 194 L. Ed. 2d 508 (2016).

In *Czapiewski,* a prisoner filed suit against prison administrators alleging, *inter alia*, that they violated the prisoner's First Amendment rights by disciplining him for reporting that he was experiencing suicidal thoughts. The prisoner had pressed the emergency call button in his cell and indicated that he was having suicidal thoughts and intended to break his own neck by jumping off the sink in his

---

[34] See *Lee v. Ferraro,* 284 F.3d 1188, 1195 (11th Cir. 2002); *United States v. Everett,* 719 F.2d 1119, 1120 (11th Cir. 1983), discussed *supra.*

cell. When the shift sergeant responded immediately to the cell, the prisoner complained that prison officials were not picking up his outgoing mail. The prisoner told the shift sergeant that so long as his mail was picked up, he would not harm himself. The shift sergeant subsequently concluded that the prisoner was only threatening self-harm so that he would have an opportunity to complain about the problems he was having with his mail to the prison officer who would respond to his call. The shift sergeant did not believe the prisoner was a threat to himself and believed that he simply wanted to complain about his mail. The prison administrators initiated disciplinary action for misusing the emergency call button. During his disciplinary hearing, the prisoner stated that he was suicidal at the time that he used the emergency call button but had changed his mind after the shift sergeant spoke with the prisoner and told the prisoner he would deliver the prisoner's outgoing mail. In evaluating the prisoner's First Amendment retaliation claim, the court held that the prisoner's subjective contention that he really did intend to commit suicide was not dispositive, explaining "the important inquiry is whether defendants reasonably believed plaintiff was lying . . .  plaintiff cannot establish that defendants violated the First Amendment if defendants reasonably believed that plaintiff's speech was not protected." *Czapiewski*, at *3.

   As in *Czapiewski*, the relevant inquiry here was whether Sullivan reasonably believed that the motivation for Prospero's calls was to disrupt the 911 Center to

attain the result she wanted, *i.e.*, a cessation of the shooting noise. For purposes of the qualified-immunity analysis, the inquiry is whether a reasonable officer could have believed, under the same circumstances, that Prospero's speech was not protected because it was made for the purpose of disrupting the 911 Center. *See Watkins v. Central Broward Regional Park*, 799 Fed. Appx. 659, 667 (11th Cir. 2020) ("[A] reasonable official could have believed, under the circumstances of this case, that [the plaintiff's] speech constituted unprotected speech."). The reasonableness of this belief is beyond question. As Sullivan explained, "[m]y dispatchers told me they felt like they were disrupted, and that the purpose of her call was to interfere with their job duties in order to have the results she wanted at a faster pace than what she was getting." *Doc. 136*, 192:25, 193:1-4. Flowers confirmed she relayed this information to Sullivan. *Doc. 228.* Prospero is not aware of any evidence to refute that dispatchers told Sullivan that Prospero's calls to the 911 Center were intentionally disruptive. *Doc. 127,* 250:1-7. And, if trained dispatchers who heard every word of the calls believed that Prospero was purposefully disruptive in repeatedly calling about a noise complaint, it cannot be said that every reasonable officer would have believed Prospero was engaging in protected speech. This is especially so because it is undisputed that Sullivan did not have any information that Prospero was supposedly complaining about a safety concern or that Prospero claimed that she was told to always call whenever she heard

gunshots.[35] It was not clearly established that Prospero's speech was constitutionally protected speech and, thus, the district court erred in denying Sullivan's motion for summary judgment on Prospero's First Amendment claim.

## CONCLUSION

The order denying Sullivan's motion for summary judgment on Prospero's First Amendment claim and Sullivan and Prescott's motion for summary judgment on Prospero's Fourth Amendment claim should be reversed, and the Court should find that Sullivan and Prescott are entitled to qualified immunity on all of Prospero's claims.

---

[35] As to Prospero's contention that she was told at some unknown point by Sheriff Proctor or Chief Deputy Byerly to call whenever she heard gunshots [*See Doc. 127,* 8-10; *Doc. 129*, 322:13-25], there is no evidence that the dispatchers, Sullivan, or Prescott were aware of this supposed instruction.  *Doc. 129,* 324:23-25, 325:1-20.

Respectfully submitted this 7th day of May, 2024.

/s/ Bradley J. Watkins
Bradley J. Watkins
Georgia Bar No. 740299
bwatkins@brbcsw.com

/s/ Emily R. Hancock
Emily R. Hancock
Georgia Bar No. 115145
ehancock@brbcsw.com

/s/ Amanda L. Szokoly
Amanda L. Szokoly
Georgia Bar No. 403412
aszokoly@brbcsw.com

**ATTORNEYS FOR APPELLANTS**

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue (31520)
Post Office Box 220
Brunswick, GA 31521-0220
(912) 264-8544
(912) 264-9667 FAX

## CERTIFICATE OF COMPLIANCE

The undersigned attorneys, counsel for Appellants, certify that this brief complies with the type volume limitation set forth in FRAP 32(a)(7)(B). Pursuant to FRAP 32(a)(7)(C)(I), the undersigned further certifies that the foregoing brief contains 12,983 words, exclusive of those portions of the brief which are not considered for word count purposes, as measured by the word count of the word processing system used to prepare the brief (Microsoft Word). The type size and style used in this brief is 14-point Times New Roman.

Respectfully submitted this 7th day of May, 2024.

/s/ Bradley J. Watkins
Bradley J. Watkins
Georgia Bar No. 740299
bwatkins@brbcsw.com

/s/ Emily R. Hancock
Emily R. Hancock
Georgia Bar No. 115145
ehancock@brbcsw.com

/s/ Amanda L. Szokoly
Amanda L. Szokoly
Georgia Bar No. 403412
aszokoly@brbcsw.com
**ATTORNEYS FOR APPELLANTS**

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue (31520)
Brunswick, GA 31520
(912) 264-8544

56