FOR PUBLICATION

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10086
_____

EMMA JANE PROSPERO,

*Plaintiff-Appellee,*

*versus*

DEPUTY RYAN SULLIVAN,
LT RUSSELL PRESCOTT,
    All former or current employees of the
    Camden County Sheriff's Office who
    are sued in their individual capacities,

*Defendants-Appellants,*

JANE OR JOHN DOES,
    All former or current employees of the
    Camden County Sheriff's Office who
    are sued in their individual capacities,

*Defendant.*

─────────────────────────

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:20-cv-00110-LGW-BWC

─────────────────────────

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

BRANCH, Circuit Judge:

Emma Jane Prospero has, by her own account, called 911 "a gazillion times." Among the issues she complained about, Prospero often called to report gunshots coming from behind a gas station near her home that the Camden County Sheriff's Office ("the Sheriff's Office") repeatedly investigated and concluded were lawful. Thanksgiving 2018 was no different. That day, Prospero and her husband called Camden County's non-emergency phone number twice, then 911 once, to report gunshots. She did so despite dispatchers telling her that deputies would not respond to her calls because the deputies had concluded the gunfire was legal. After her calls, defendant Deputy Ryan Sullivan and his supervisor, defendant Lieutenant Russell Prescott (collectively "defendants"), swore out an arrest-warrant affidavit and had Prospero arrested for violating O.C.G.A. § 16-11-39.2(b)(2), which prohibits disruptive or harassing conduct during 911 calls.[1]

─────────────────────────

[1] The statute criminalizes misuse of the 911 system providing, in relevant part, that

> [a] person commits the offense of unlawful conduct during a
> 9-1-1 telephone call if he or she: . . . [c]alls or otherwise contacts
> 9-1-1, whether or not conversation ensues, for the purpose of

Prospero then brought this lawsuit after the Camden County District Attorney's Office dismissed the charge against her. Prospero's operative complaint alleged, in relevant part,[2] a deprivation of her First Amendment rights, unlawful seizure or arrest in violation of the Fourth Amendment, and malicious prosecution in violation of the Fourth Amendment, all against Deputy Sullivan and Lieutenant Prescott.

This appeal reaches us on the district court's denial of qualified immunity to defendants on Prospero's First Amendment retaliation claim and her malicious-prosecution claim. We now must decide (1) whether defendants get the benefit of the 911 dispatchers' collective knowledge about Prospero's history of 911 calls about lawful gunfire; and (2) if so, armed with such collective knowledge, including their knowledge of the events of Thanksgiving 2018, whether Deputy Sullivan and Lieutenant Prescott had arguable probable cause to arrest Prospero for violating O.C.G.A. § 16-11-39.2(b)(2). We answer "yes" to both questions and accordingly conclude that Deputy Sullivan and

---

annoying, harassing, or molesting a 9-1-1 communications officer or for the purpose of interfering with or disrupting emergency telephone service.

O.C.G.A. § 16-11-39.2(b)(2).

[2] The only claims on appeal are Prospero's claims against Deputy Sullivan and Lieutenant Prescott; accordingly, we do not discuss the remaining claim or defendant.

Lieutenant Prescott are entitled to qualified immunity. Thus, after careful review and with the benefit of oral argument, we reverse.

## I.    Background

Prospero moved to Camden County in 2011. Since then, Prospero estimated that she has called the Sheriff's Office hundreds of times. Prospero called 911 to report a variety of issues, but her most common call was to report the sound of gunshots. The gunfire often emanated from the same location: private property behind a Chevron gas station near Prospero's home. The Sheriff's Office repeatedly investigated the gunfire and concluded that the shots were legal and safe.

Prospero's serial 911-dialing came to a head on November 22, 2018. That day, Prospero called Camden County's non-emergency number and reported, "there's a ton of shots behind the Chevron station over here . . . . Can you get somebody over there to tell them to stop shooting[?]" Prospero emphasized she "just want[ed] the shooting to stop" because she was "trying to enjoy [her] Thanksgiving." The dispatcher on the call, Deputy John Archibald, told Prospero that someone would respond to the call, and the call ended. Deputy Archibald called Deputy Sullivan and told him, "[c]aller is advising she's hearing shots coming from behind [the Chevron station]. She wants it to stop so she can enjoy her dinner." Deputy Sullivan responded that the area behind the Chevron is private property, and he was "not going to go back there and make somebody stop shooting." Deputy Sullivan, referring to the shooters, told Deputy Archibald he was "familiar

with who that is."  Deputy Sullivan testified in his deposition that before November 22, 2018, he was familiar with the owner of the land "shooting in the area at his range."

Four minutes later, Prospero and her husband called the non-emergency number again.  Prospero's husband again reported shooting behind the Chevron.  This time, Deputy Archibald responded that the property is a hunting club on private property. The Prosperos replied that the Sheriff's Office "need[s] to tell them to stop" the gunshots and that the Sheriff's Office had "always stopped it before."  The Prosperos then declined an opportunity to speak with a deputy, and Deputy Archibald ended the call by telling the Prosperos to enjoy the rest of their day.  Deputy Archibald did "nothing" in response to this call, instead returning to "business as usual."

Shortly thereafter, Deputy Sullivan contacted the dispatch center and asked the supervisor, Sergeant Nikki Flowers, "[d]o people not have anything better to do than to bitch about somebody shooting on private property?"  Deputy Sullivan told Sergeant Flowers that the gunfire was from "the [owners] back there shooting on their private property."[3]  Sergeant Flowers agreed, and Deputy Sullivan reiterated that he was not "going out there [to] talk to [the owners] about, 'Hey, man, you can't shoot on your private property because you're disturbing people.'"

_____

[3] By this time, however, Deputy Sullivan had not yet traveled to personally confirm if the gunfire about which the Prosperos complained on this occasion was lawful.

Deputy Sullivan then told Sergeant Flowers to "let [the Prosperos] leave their fucking address or something or request contact" and he would "let them know how stupid they are." Sergeant Flowers told Deputy Sullivan that the dispatch center was familiar with the callers. Indeed, Sergeant Flowers later testified in her deposition that she was familiar with the Prosperos' history of calls to the Sheriff's Office, especially concerning their complaints about lawful gunfire.

Prospero, unsatisfied by the outcomes of her calls to the non-emergency number, escalated, dialing 911. Prospero again reported that "[t]here's tons of shots and they keep going and going and going around the Chevron station over there." Deputy Archibald, again fielding Prospero's call, told Prospero "[t]hat's the hunting club back there." Prospero responded that the shots were "too close to the neighborhood. The shots are coming too close. They need to stop it." Deputy Archibald asked if Prospero would "like to see a deputy about this" and reiterated that deputies told him the shooting emanated from "the private property hunting club." Prospero responded, "because of the noise ordinances, they're not supposed to have that. We've already been through this before, and they've stopped it. So we want it stopped. We don't want to live next to the firing." Deputy Archibald reiterated that deputies "are not going to go out there," but repeated his offer to send a deputy to the Prosperos' home to discuss the matter.

Deputy Archibald then transferred the call to Sergeant Flowers, who told Prospero, "when we gave [Deputy Sullivan] the

location of where the shots were coming from, he advised that it is private property. It is a hunting club. They are well within their rights to shoot on that property." Prospero insisted "that's not what [the Prosperos had] been told because of the noise ordinance." Sergeant Flowers told Prospero the noise ordinance did not apply because the property is "not inside the city limits of the City of Woodbine." Prospero retorted, "[r]ight, I understand, but if—if the shots are coming too close to people's homes . . . ." Sergeant Flowers told Prospero that dispatch would send a deputy to the Prosperos' home to talk to them about this incident. Prospero told Sergeant Flowers that she did not want a deputy to visit and that if one did, she would call "the TV station." Prospero also told Sergeant Flowers, "I'm not answering the door. We're leaving. Good-bye."

As promised, Deputy Sullivan arrived at the Prosperos' home soon after Prospero's 911 call. He knocked, but nobody answered. He had the dispatch center call Prospero twice, but nobody answered either call. After Prospero refused to speak with anyone, Deputy Sullivan began investigating Prospero's actions as a possible crime because, based on "the information that [he] had received at the time, [he] believed [Prospero's] intentions were to be disruptive to the dispatchers until she got the answer or got the services that she would like." Deputy Sullivan requested the Computer-Aided Dispatch ("CAD") reports of Prospero's calls, and he asked the dispatch center to print Prospero's information. Deputy Sullivan spoke with another dispatcher who told him that Prospero "didn't use offensive language or curse," she "just was not

a happy camper" who wanted deputies to stop the gunshots. While at the Prosperos' home, Deputy Sullivan unsuccessfully tried to contact the owners of the land behind the Chevron to confirm if the gunfire Prospero heard was legal. Deputy Sullivan then went to the dispatch center where he believes he spoke with Deputy Archibald and Sergeant Flowers. Deputy Sullivan testified in his deposition that the "dispatchers told [him] they felt like they were disrupted, and that the purpose of [Prospero's] call was to interfere with their job duties in order to have the results she wanted at a faster pace than what she was getting." Deputy Sullivan did not listen to recordings of Prospero's calls, instead relying on the dispatchers to tell him what happened.

Deputy Archibald, however, denied speaking to Deputy Sullivan following Prospero's 911 call. Nevertheless, Deputy Archibald did believe that Prospero's 911 call was disruptive and harassing. And although Sergeant Flowers did not "recall where or in what manner" she rendezvoused with Deputy Sullivan, she "specifically recall[ed] telling Deputy Sullivan during the course of his investigation of the calls on Thanksgiving Day that [she] believed [Prospero's] calls and communications with the 911 Center that day were purposefully disruptive." Moreover, Sergeant Flowers testified that Prospero's calls

> had become not only harassing but a nuisance in the
> fact that with her tying up a 911 line in the way that
> she did could have—regardless of whether or not we
> were busy at the time, regardless of whether or not it

was stopping us from doing any work that we could have been doing or were not doing at the time, it takes seconds for something to happen and—for an emergency to happen.  And in the time that she's tying up one line, five other lines can start ringing, and it would be someone who is in actual need of emergency services . . . .  And if we have a nuisance caller on the line who has already repeatedly been told what is going on, and . . . she's not satisfied nor does she want the services that are being offered to her at that point [she] is harassing the 911 center and potentially preventing us from helping someone else.

Lieutenant Prescott assisted Deputy Sullivan in his investigation of Prospero.[4]  Lieutenant Prescott was familiar with the property behind the Chevron station and believed Deputy Sullivan would also be familiar with the area because Deputy Sullivan lived in Camden County "all his life."  Moreover, Lieutenant Prescott testified in his deposition, "[w]e've all hunted in this area and everything between hunting and fishing and stuff like that—I would know generally what direction the shots would be coming from without even having to be on scene."  As part of

---

[4] Lieutenant Prescott had responded to some of Prospero's calls before, but those incidents occurred years earlier and Lieutenant Prescott, in his deposition, had little to no memory of those incidents.

the investigation, Lieutenant Prescott spoke to a dispatcher,[5] telling the dispatcher he and Deputy Sullivan were collecting information about Prospero's calls so that they could charge her with a crime. The dispatcher suggested Lieutenant Prescott and Deputy Sullivan listen to the tapes of the calls, but Lieutenant Prescott later explained that standard practice is to receive the relevant information directly from the dispatchers because the "dispatchers are sworn in by [the] sheriff just like" the officers are.

At the end of their investigation, Deputy Sullivan decided to charge Prospero with calling 911 for the purpose of disrupting an emergency telephone service in violation of O.C.G.A. § 16-11-39.2, and Lieutenant Prescott agreed with Deputy Sullivan's decision. Accordingly, that same day, Deputy Sullivan submitted an affidavit for an arrest warrant charging Prospero with "[u]nlawful [c]onduct during [a] 911 [c]all." Because the contents of the affidavit are the subject of heavy dispute in this case, we have reproduced it below in its entirety, and we will discuss certain portions in our analysis where relevant:

> On November 22nd, 2018 at approximately 1442 hours, the Camden County Public Safety Complex received a call for alleged emergency service in reference to shots being fired in the area of 84 Magna Carta Drive. The call was taken by

---

[5] This dispatcher was Heather Sievers. She did not receive any of Prospero's calls on Thanksgiving 2018, but she "could have listened in" to the calls. Sievers was not deposed in this case.

correctional staff and forwarded the call to the Camden County Emergency Dispatch Center. The caller, later identified as Ms. Emma J. Prospero, advised the Camden County Emergency Dispatch Center that she heard *shots being fired from behind her residence in the area of the hunting club behind the Chevron Truck Stop*. Ms. Prospero advised dispatchers that she did not want contact from law enforcement but *she wanted the shooting to be stopped*. She stated the shooting needed to be stopped so she could enjoy her Thanksgiving dinner.

Ms. Prospero ended the phone call by hanging up *after refusing to give any further information*. Being from the immediate area, *I knew the shots were being fired from private property in which the individuals shooting were well in their rights to be shooting*. After receiving the call for service, *I advised the Camden County Dispatch Center that the subjects allegedly shooting had every right to do so on the private property of a hunting club* which is the location Ms. Prospero stated the shots were coming from. Ms. Prospero's husband contacted the Camden County Emergency Dispatch Center by using the non-emergency phone number at approximately 1452 hours and stated the same information that was given to dispatcher before by Ms. Prospero and still refused to speak to law enforcement.

*Dispatchers relayed the information given by me* stating that the subjects shooting were within their rights to do so but *Ms. Prospero's husband did not agree with the answer and hung up the phone.* At 1458 hours, Ms. Prospero contacted 9-1-1, stating that she wanted the shooting from the hunting club to stop. She was given the same information that was given to [her] husband in reference to the subjects being within their rights to be shooting firearms on private property. *Ms. Prospero began arguing with Emergency Dispatcher* by stating the gun shots were in violation of noise ordinances and that it needed to be stopped so she could enjoy her dinner. After being advised that a Deputy would be en route to her residence to speak with her, Ms. Prospero repeatedly stated that she would not answer her door or she would leave the residence if law enforcement responded to speak with her. She then stated she would be contacting the local new[s] stations if a deputy responded to her residence.

Due to Ms. Prospero calling 9-1-1 which is an emergency telephone service used for emergency phone calls and for individuals needing emergency service, deputies with the Camden County Sheriff's Office are required to respond to the residence or location the call is made from if that information is known. I arrived at 84 Magna Carta Drive at

approximately 1515 hours and stood in the driveway
for several moments without hearing any gunshots in
the area.  I knocked on the front door of the residence
in an attempt to make contact with Ms. Prospero but
met negative results two separate times.  I asked the
Camden County Emergency Dispatch Center to
contact Ms. Prospero's phone number that was used
to call 9-1-1 but they stated the phone went to
voicemail both times they attempted calling.  Contact
was never made with Ms. Prospero while on scene at
her residence.  I did not hear any gun shots in the area
while on scene at Ms. Prospero's residence.  Ms.
Prospero contacted 9-1-1 (an emergency telephone
service) after first contacting the non-emergency
number twice and refused to make contact with law
enforcement.  Ms. Prospero disrupted an emergency
telephone service for service that was not an
emergency.

(emphasis added).    The affidavit also stated that Prospero
"commit[ted] the offense . . . on November 22, 2018 at 02:58 PM to
November 22, 2018 at 03:30 PM."

In his deposition, Deputy Sullivan conceded that he made
some assumptions about the lawfulness of the gunfire and from
where it emanated when he declined to respond to Prospero's calls.
And Lieutenant Prescott explained that Prospero's calls themselves
did not last 32 minutes like the affidavit suggests; instead, the

affidavit "refer[s] to the duration of the amount of manpower utilized towards that call."

Law enforcement arrested Prospero on January 28, 2019. She was detained at the Camden County Jail. Prospero was released on bond on January 30, 2019. Several months later, in November 2019, the Camden County District Attorney's Office dismissed the charge against Prospero.

Then, in October 2020, Prospero brought this suit. As relevant to this appeal, Prospero's operative complaint alleged several claims against Deputy Sullivan and Lieutenant Prescott: a deprivation of her First Amendment rights, unlawful seizure or arrest in violation of the Fourth Amendment, and malicious prosecution in violation of the Fourth Amendment. After discovery, Prospero moved for partial summary judgment on the issue of probable cause and on her malicious-prosecution claim. Defendants also moved for summary judgment, principally arguing that they (1) were entitled to qualified immunity on all claims and (2) had probable cause to charge Prospero. The district court denied Prospero's motion for summary judgment and granted in part and denied in part defendants' motion for summary judgment.

In its order, the district court granted summary judgment to Lieutenant Prescott on Prospero's First Amendment claim, denied summary judgment to Deputy Sullivan on Prospero's First Amendment claim, granted Lieutenant Prescott and Deputy Sullivan summary judgment on Prospero's unlawful seizure claim,

and denied Lieutenant Prescott and Deputy Sullivan summary judgment on Prospero's malicious-prosecution claim. The district court found genuine disputes of material fact concerning (1) whether Prospero engaged in constitutionally protected speech by calling 911, (2) whether Deputy Sullivan had probable cause to arrest Prospero, and (3) whether Deputy Sullivan and Lieutenant Prescott's warrant application failed to establish probable cause or included intentional or reckless false misstatements or omissions. Moreover, the district court stated that it is clearly established that an officer violates the Fourth Amendment if he makes intentional or reckless false misstatements or omissions in procuring an arrest warrant. Deputy Sullivan and Lieutenant Prescott timely appealed the district court's denial of qualified immunity as to Prospero's First Amendment and malicious-prosecution claims. Prospero did not file a separate appeal.

## II.    Discussion

As an initial matter, Prospero argues that this Court lacks jurisdiction to hear this appeal. Accordingly, we address this jurisdictional question first before proceeding to defendants' arguments concerning qualified immunity as to Prospero's First Amendment and malicious-prosecution claims.

### A.    *We have jurisdiction over this appeal*

The district court, in relevant part, denied Deputy Sullivan qualified immunity on Prospero's First Amendment retaliation claim and denied both defendants qualified immunity on Prospero's malicious-prosecution claim. Defendants appealed this

denial. Prospero argues we lack jurisdiction over defendants'
appeal because the appeal "boils down to nothing more than
disagreement with the District Court's factual findings and
inferences, neither of which are reviewable on an interlocutory
appeal of the denial of qualified immunity." Defendants respond
that they appeal from the district court's application of the wrong
legal standards. The defendants are correct, and we accordingly
have jurisdiction.

"Federal courts are courts of limited jurisdiction." *Kokkonen
v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). We
"possess only that power authorized by Constitution and statute."
*Id.* For us, our power principally includes the ability to hear
"appeals from all *final* decisions of the district courts of the United
States." 28 U.S.C. § 1291 (emphasis added). Conversely, "as a court
of limited jurisdiction, we are generally barred from entertaining
appeals of non-final orders because we have no congressional grant
to do so." *Hall v. Flournoy*, 975 F.3d 1269, 1274 (11th Cir. 2020).

"But as with just about every rule, exceptions exist. The one
applicable here allows interlocutory appeal of a district court's
denial of qualified immunity, since where it applies, that defense
entitles the holder to immunity from not just liability, but from the
lawsuit altogether." *Patel v. City of Madison*, 959 F.3d 1330, 1337
(11th Cir. 2020); *see Hudson v. Hall*, 231 F.3d 1289, 1293 (11th Cir.
2000).

Even this exception, however, has exceptions. "Whether
we have interlocutory jurisdiction to review the denial of summary

judgment on qualified immunity grounds depends on the type of issues involved in the appeal." *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024) (quotation omitted). "[W]hen legal questions of qualified immunity are raised—either to determine whether any constitutional right was violated or whether the violation of that right was clearly established—interlocutory appellate jurisdiction exists." *Hall*, 975 F.3d at 1276. "But if the only question before the appellate court is a factual one, review must wait for a later time." *Id.* In other words, "where . . . the appellant is merely claiming, 'we didn't do it,' interlocutory review is foreclosed." *Id.* at 1278 (internal citation omitted).

But where an appellant raises both legal and factual questions, we have jurisdiction to review both issues. *See id.* at 1276; *Behrens v. Pelletier*, 516 U.S. 299, 311–13 (1996); *Nelson*, 89 F.4th at 1296. In such a case, we have two options, "[w]e may accept the district court's findings of fact if they are adequate," or "we may conduct our own analysis of the facts in the light most favorable to the plaintiff." *Nelson*, 89 F.4th at 1296 (quotations omitted). But "[e]ven if we chose the latter course, we will not disturb a factual finding by the district court if there is any record evidence to support that finding."[6] *Id.* (quotation omitted).

---

[6] Additionally, we note that this appeal reaches us on a denial of summary judgment. "We review *de novo* a district court's denial of a motion for summary judgment on qualified immunity grounds," accepting the plaintiff's version of the facts and drawing all inferences in her favor. *Carter v. Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016). "Summary judgment is appropriate only

Here, defendants raise both legal and factual issues. Specifically, defendants argue that the district court failed to apply the correct legal standards governing qualified immunity, noting in particular the failure to apply the collective-knowledge doctrine to defendants.[7] We have jurisdiction over those issues. *See, e.g.*, *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (exercising jurisdiction over a case in which "defendants argue[d] that the district court applied the wrong legal standard to assess qualified immunity" and "under the correct standard, they had arguable probable cause"). Accordingly, we have jurisdiction over this appeal. *See Hall*, 975 F.3d at 1276; *Nelson*, 89 F.4th at 1296.

> B. *The district court erred by failing to give Deputy Sullivan and Lieutenant Prescott the benefit of the 911 dispatchers' collective knowledge of Prospero's history of 911 calls in considering whether they have qualified immunity as to*

---

when the moving party demonstrates that no disputed issue of material fact exists." *Id.*

[7] The collective-knowledge doctrine is a legal doctrine that allows us to "aggregate the officers' knowledge at any given moment" to determine if they had probable cause for an arrest, rather than evaluate each officer's actual knowledge in isolation. *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). The doctrine applies so long as the officers "maintained at least a minimal level of communication [with each other] during their investigation." *Id.*

*both the First Amendment and the malicious-prosecution claims*

Turning to the merits of the claims on appeal, defendants contend that the district court erred by failing to impute the collective knowledge about Prospero from the 911 dispatchers to defendants in evaluating their entitlement to qualified immunity. Prospero responds that Deputy Sullivan disclaimed reliance on collective knowledge, and, even if collective knowledge applied, such knowledge "only further eliminates qualified immunity." Defendants reply that Deputy Archibald's and Sergeant Flowers's knowledge of Prospero's calls helped give defendants probable cause to arrest Prospero.

We agree with defendants that they get the benefit of Sergeant Flowers's knowledge about Prospero and her calls, which ultimately supports arguable probable cause and defendants' qualified immunity. To explain why the collective-knowledge doctrine applies in this case, we first take a step back to explain why the officers' or the dispatchers' knowledge is relevant to their claims of qualified immunity in the first place.

1.    Whether defendants are entitled to qualified immunity ultimately depends on the officers' knowledge when they sought Prospero's arrest

Qualified immunity "shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." *Wate v. Kubler*, 839

F.3d 1012, 1018 (11th Cir. 2016).    When a defendant asserts qualified immunity, we must answer two questions: (1) whether the defendant violated the plaintiff's statutory or constitutional right, and (2) whether that right was clearly established at the time of the defendant's conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).[8] As we will explain, for both of Prospero's claims on appeal, whether defendants are entitled to qualified immunity depends on whether defendants had arguable probable cause to seek Prospero's arrest.

Turning to Prospero's first claim, a Fourth Amendment malicious-prosecution claim requires the plaintiff to "prove both (1) the elements of the common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (quotation omitted).  The elements of the common-law tort of malicious prosecution "include: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id.* (alterations adopted) (quotation omitted).    The Fourth Amendment "adds two elements: The plaintiff must establish (5) that the legal process justifying her seizure was constitutionally

---

[8] We also ask a threshold question: whether the defendant "acted within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Wate*, 839 F.3d at 1018.  The district court found that defendants acted "within the scope of their discretionary duties at all relevant times." Prospero does not dispute that determination on appeal.

infirm and (6) that her seizure would not otherwise be justified without legal process." *Id.* at 1111–12 (alterations adopted) (quotation omitted).

Of those six elements, the first, third, and fourth are uncontested in this case. Of the remaining elements, we have explained that "the second element effectively merges into the fifth" because of the "significant overlap" between those elements. *Id.* at 1112 (quotation omitted). And a plaintiff can satisfy the fifth and sixth elements "by proving that [the defendant] intentionally or recklessly made misstatements or omissions necessary to support the warrant that justified his seizure." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (quotation omitted). Thus, at bottom, the second, fifth, and sixth elements collectively require us to consider (1) whether the defendant intentionally or recklessly made misstatements or omissions in the arrest affidavit, and (2) whether the arrest affidavit "still would have established probable cause" absent the misstatements or omissions. *Butler*, 85 F.4th at 1116 (quotation omitted).[9] Prospero's malicious-prosecution claim thus depends on whether she can show that defendants lacked probable cause to seek her arrest.

---

[9] We note that when we determine whether an officer made a misstatement or omission that was intentionally or recklessly false, we must keep in mind "the leeway that the Fourth Amendment gives law enforcement officers to make reasonable mistakes." *Butler*, 85 F.4th at 1114. "An officer who files an affidavit in support of an arrest warrant need only have a reasonable belief in the veracity of the information that she provides, regardless of whether it turns out to be true." *Id.* (alteration adopted) (quotation omitted).

The same is true of Prospero's First Amendment retaliation claim: it also depends on the absence of probable cause. To establish her claim, she "must show: (1) she engaged in constitutionally protected speech, such as her right to petition the government for redress; (2) the defendant's retaliatory conduct adversely affected that protected speech and right to petition; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). When (as here) the alleged retaliatory conduct is an arrest, "[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim." *Nieves v. Bartlett*, 587 U.S. 391, 405 (2019). Thus, "when the governmental defendant has utilized the legal system to arrest" the plaintiff, the plaintiff must "plead and prove an absence of probable cause as to the challenged retaliatory arrest . . . in order to establish the causation link between the defendant's retaliatory animus and the plaintiff's injury." *DeMartini*, 942 F.3d at 1289.

Qualified immunity adds an additional wrinkle to our probable-cause analysis for both the First Amendment and malicious-prosecution claims. Because a defendant's "assertion of qualified immunity can be defeated only by a showing of 'clearly established' law, we will review not for *actual* probable cause but rather for 'arguable' probable cause." *Butler*, 85 F.4th at 1116 (emphasis added) (quotation omitted); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010); *see, e.g., Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold

that the officers had arguable probable cause to arrest Anderson for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims.").

The arguable-probable-cause standard, in turn, "asks whether a reasonable officer in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed." *Butler*, 85 F.4th at 1116 (alteration adopted) (quotation omitted). Accordingly, for arrests based on warrants (as we have here), we ask one "controlling question: Given the (1) information that [the defendant] included in [his] affidavits and (2) the material information that *[]he knew* but omitted from those affidavits" or affirmatively misstated, "could a reasonable officer have believed that probable cause existed to arrest" the plaintiff?[10] *Id*. (emphasis added); *see also Garcia*, 75 F.4th at 1187–88. If we conclude that "the affidavits (including the omitted [or corrected] information) would have demonstrated even arguable probable cause—that a reasonable officer could have

---

[10] As we have explained, however, we cannot consider *everything* a defendant knew but omitted from his warrant affidavit. Rather, we consider only "exculpatory evidence that was omitted from the affidavit." *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330–31 (11th Cir. 2024). "[A]n otherwise insufficient affidavit cannot be rehabilitated with information possessed by the officer when he sought the warrant but not disclosed to the issuing magistrate." *Butler*, 85 F.4th at 1113 (alterations adopted) (quotation omitted); *see Sylvester*, 94 F.4th at 1330 ("[I]t is no response to Sylvester's malicious prosecution claim that Detective Barnett could have, but did not, present inculpatory evidence in the affidavit that established probable cause for an arrest.").

believed an offense was committed—then the officers are entitled to qualified immunity." *Paez v. Mulvey*, 915 F.3d 1276, 1288 (11th Cir. 2019) (emphasis omitted).

In sum, Prospero's Fourth Amendment malicious-prosecution claim and her First Amendment retaliation claim both require Prospero to demonstrate that defendants lacked probable cause to seek her arrest. But for defendants to receive qualified immunity, they need only have had "arguable" probable cause for the arrest. Arguable probable cause depends, in part, on what defendants knew when they sought Prospero's arrest pursuant to a warrant. Accordingly, we next define the boundaries of what defendants "knew."

2.    Sworn 911 dispatchers' knowledge may be imputed to defendants via collective knowledge

When we determine "what the [defendants] knew at the time of the [plaintiff's] arrest," we consider "the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation."[11] *Garcia*, 75

---

[11] We reject Prospero's argument that Deputy Sullivan "disavowed" reliance on collective knowledge. Deputy Sullivan did not "disavow" collective knowledge; rather, he testified he did not have actual knowledge of Prospero or her previous 911 calls when he swore out the warrant affidavit. But of course, the collective knowledge doctrine only makes a difference in cases where some officers lack actual knowledge of some information. If we adopted Prospero's argument and limited ourselves to reviewing officers'

F.4th at 1188 (quotation omitted); *see also Grider*, 618 F.3d at 1257; *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Typically, we have only applied this collective-knowledge doctrine among the investigating and arresting police officers—here, Deputy Sullivan and Lieutenant Prescott. *See, e.g., Garcia*, 75 F.4th at 1188–89; *Valderrama v. Rousseau*, 780 F.3d 1108, 1115 (11th Cir. 2015). But the doctrine applies with equal force to the 911 dispatchers in this case: the Camden County dispatchers were law "officers" with the Sheriff's Office who were "sworn in by [the] sheriff just like" any other law enforcement officer. *See, e.g., Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1294, 1302 (11th Cir. 2021) (imputing to officers' collective knowledge information that a caller had given to police on a 911 call).[12] Thus, we treat the dispatch officers in this case as "law officers" whose knowledge about Prospero may be imputed to defendants "if they maintained at least a minimal level of communication during their investigation." *Garcia*, 75 F.4th at 1188 (quotation omitted).

_____

actual knowledge anytime the officers admitted they did not actually know something, we would never have use for the collective knowledge doctrine.

[12] Our decision to consider the dispatchers' knowledge in this case also finds support among our sister circuits. *See, e.g., United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) ("[T]he dispatcher's knowledge is properly considered as part of our analysis of reasonable suspicion."); *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994) (*en banc*) ("[W]here officers are told to investigate a situation without being told all of the facts justifying investigation, the court must look beyond the specific facts known to the officers on the scene to the facts known to the dispatcher.").

Turning to Sergeant Flowers, the record demonstrates that her knowledge may be imputed to defendants.[13]  Sergeant Flowers was a sworn dispatch officer on Thanksgiving 2018 when she spoke to Prospero.  That day, after Deputy Sullivan declined to respond to Prospero's non-emergency calls, Sergeant Flowers agreed that the calls did not warrant a response and told Deputy Sullivan that dispatch was familiar with the callers.  Specifically, Sergeant Flowers was familiar with the Prosperos' history of calls to the Sheriff's Office, especially concerning their complaints about gunfire that turned out to be lawful and safe.  Moreover, both Deputy Sullivan and Sergeant Flowers stated that they later met and discussed Prospero and her calls during Deputy Sullivan's investigation of Prospero, although the details were hazy concerning when or where that meeting occurred.  Accordingly, we will impute Sergeant Flowers's knowledge about Prospero's past complaints of lawful gunfire to defendants.  *See id.*

C.    *Deputy Sullivan and Lieutenant Prescott had arguable probable cause to seek Prospero's arrest*

We now decide whether defendants, considering their actual and collective knowledge, had arguable probable cause to seek Prospero's arrest.  We conclude that they did.  Accordingly, they are entitled to qualified immunity.

---

[13] Sergeant Flowers's knowledge suffices to resolve this appeal.  Accordingly, we do not specifically address Deputy Archibald's or Heather Sievers's knowledge, two dispatchers who also communicated with Deputy Sullivan.

We begin first with "the elements of the charged crime," here, misuse of the 911 system. *Butler*, 85 F.4th at 1116 (emphasis omitted). Under Georgia law,

> A person commits the offense of unlawful conduct during a 9-1-1 telephone call if he or she: . . . Calls or otherwise contacts 9-1-1, whether or not conversation ensues, for the purpose of annoying, harassing, or molesting a 9-1-1 communications officer or for the purpose of interfering with or disrupting emergency telephone service.

O.C.G.A. § 16-11-39.2(b)(2). The text of the statute establishes two elements of this crime: the offender must (1) contact 911 (2) with the intent to interfere with or disrupt the 911 dispatchers. *See id.* The parties agree that Prospero contacted 911; this case turns on Prospero's intent when she did so—and by extension, whether a reasonable officer in Deputy Sullivan or Lieutenant Prescott's shoes could have believed there was probable cause Prospero had such an intent.

With that question in mind, we first consider the information included in Deputy Sullivan's warrant affidavit, then we consider Prospero's arguments concerning omitted exculpatory information or misstatements in the affidavit. *See Butler*, 85 F.4th at 1113–16; *Sylvester*, 94 F.4th at 1330–31. In our review for arguable probable cause, we note that "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an

arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001). Deputy Sullivan's warrant affidavit included the following facts:

- On November 22, 2018, Prospero called for "alleged emergency service."

- Prospero told dispatch she was calling because "she heard shots being fired from behind her residence in the area of the hunting club behind the Chevron Truck Stop."

- Prospero "did not want contact from law enforcement but she wanted the shooting to be stopped."

- Prospero "ended the phone call by hanging up after refusing to give any further information."

- Deputy Sullivan "knew the shots were being fired from private property in which the individuals shooting were well within their rights to be shooting."

- Then, Prospero's husband called the non-emergency number "and stated the same information that was given to dispatcher before by Ms. Prospero and still refused to speak to law enforcement."

- "Dispatchers relayed the information given by [Deputy Sullivan] stating that the subjects shooting were within their rights to do so but Ms. Prospero's husband did not agree with the answer and hung up the phone."

- Then, Prospero called 911 and stated "she wanted the shooting from the hunting club to stop."

- Prospero "began arguing with Emergency Dispatcher by stating the gun shots were in violation of noise ordinances and that it needed to be stopped so she could enjoy her dinner."

- Prospero rejected opportunities to speak with a deputy and stated she would contact local news stations.

- Deputy Sullivan arrived at the Prosperos' home but could not contact the Prosperos.

Together, the facts in the warrant affidavit establish arguable probable cause. Specifically, those facts show that when defendants sought Prospero's arrest, defendants knew or reasonably believed (1) Prospero called the non-emergency number to complain about gunfire coming from behind the Chevron; (2) such gunfire was lawful; (3) dispatchers told Prospero that deputies would not respond to the lawful gunfire; (4) nevertheless, Prospero called 911 to complain about the same issue; and (5) Prospero declined police contact. From these facts, a reasonable officer could have believed that probable cause existed to arrest Prospero for unlawful conduct during a 911 call. *See Butler*, 85 F.4th at 1116.

We now consider whether Prospero "can attack as inaccurate statements of fact that were in the affidavit [or] present exculpatory evidence that was omitted from the affidavit" to defeat

arguable probable cause. *Sylvester*, 94 F.4th at 1330–31. Prospero argues that the evidence established several misstatements or omissions in Deputy Sullivan's affidavit. According to Prospero, the misstatements or omissions that she cites demonstrate a genuine dispute of material fact about whether defendants had arguable probable cause, precluding summary judgment in defendants' favor. But we explain in turn why each of her arguments is insubstantial pageantry:

- Prospero argues that the affidavit misstates that her first call was for "alleged emergency service" when she actually called the non-emergency number. The warrant later specifies, however, that Prospero called the "non-emergency number" before calling 911.

- Prospero argues that the affidavit omitted that the Camden County Emergency Dispatch Center handles both emergency and non-emergency calls. But this fact is irrelevant to Prospero's intent when she called 911.

- Prospero argues that the affidavit mischaracterizes how uncooperative she was on her first non-emergency call, but her demeanor on a non-emergency call is irrelevant to her intent when she called 911.

- Prospero argues that the affidavit misstates the degree of Deputy Sullivan's knowledge: Deputy Sullivan did not *know* the gunfire lawfully emanated from a private hunting club when he declined to respond to Prospero's non-

emergency calls; rather, he assumed this fact without verification. This distinction is refuted by Sergeant Flowers's knowledge that we have, as discussed, imputed to Deputy Sullivan. Sergeant Flowers testified that she recalled several complaints about gunshots emanating from behind the Chevron station, all from "Mrs. Prospero and her husband." Sergeant Flowers also knew that when officers went to investigate Prospero's previous calls about gunshots, the officers "found that it was private property and a hunting club." Sergeant Flowers emphasized that by Thanksgiving 2018, "several deputies had responded previously to the same area previously for the same complaints from these same individuals." Because Sergeant Flowers's knowledge is imputed to Deputy Sullivan, Deputy Sullivan had a factual basis for this statement in the warrant affidavit.[14]

- Prospero argues that the affidavit omits exculpatory information that Prospero sought only to stop the gunfire, not to disrupt the 911 service. We reject this argument

---

[14] For good measure, we also note that Deputy Sullivan grew up in the area, knew the owners of the property behind the Chevron station, and knew that they shot at a range on the property. Deputy Sullivan's familiarity with the area and owners also gave him a reasonable belief that the gunfire was legal, which is an acceptable basis for statements made in a warrant affidavit. *See Butler*, 85 F.4th at 1114.

because the affidavit repeatedly states that the Prosperos called because they wanted the shooting to stop.

- Prospero argues that the affidavit misstates that she was on the phone with 911 for 32 minutes when her calls were only a few minutes long.  We reject this argument because although the affidavit says Prospero "commit[ted]" the offense from 2:58 PM to 3:30 PM, the narrative section describes that Prospero's 911 call was placed at 2:58 PM, and by 3:15 PM, Deputy Sullivan had arrived at the Prosperos' house and asked dispatch to try calling Prospero again.  Thus, the factual narrative shows that Prospero's 911 call did not last until 3:30 PM.  But in any event, the relevant inquiry is whether Prospero called 911 *with intent* to be disruptive.  *See* O.C.G.A. § 16-11-39.2(b)(2).  The degree of her success in actually being disruptive—as measured by how long she occupied a dispatch officer—is irrelevant.

- Prospero argues that the affidavit could be read to say that Prospero mentioned a hunting club when she never did.  But Prospero cites no evidence that this purported misstatement is anything other than ambiguity in the text of the affidavit.

- Prospero argues that the affidavit misstates that she called the non-emergency number twice before calling 911 when Prospero only called the non-emergency number once.  Her husband called the second time.  The factual narrative

of the affidavit correctly explains, however, that Prospero's husband placed the second non-emergency call.

Thus, Prospero fails to demonstrate a genuine dispute of material fact about whether Deputy Sullivan made any intentional or reckless misstatements or omissions in his warrant affidavit. And as discussed, the undisputed material facts contained in the warrant affidavit demonstrate arguable probable cause. Based on the events of Thanksgiving 2018, a reasonable officer could have believed that probable cause existed to arrest Prospero for calling 911 "for the purpose of interfering with or disrupting emergency telephone service." O.C.G.A. § 16-11-39.2(b)(2); *see Butler*, 85 F.4th at 1116.[15]

\*          \*          \*

As we have explained, the existence of probable cause defeats Prospero's First and Fourth Amendment claims premised on her arrest. *See Nieves*, 587 U.S. at 405; *Butler*, 85 F.4th at 1116. Thus, the existence of *arguable* probable cause entitles Deputy

---

[15] Throughout her brief, Prospero insists that she made her real purpose clear on the calls: she just wanted deputies to stop the gunshots. We reject Prospero's implication that she could have only one purpose at any given time. Georgia prohibits all purposefully disruptive 911 calls regardless of whether those calls are a means to a lawful end or are an end in themselves. *See* O.C.G.A. § 16-11-39.2(b)(2). In other words, Prospero still broke Georgia law if she was purposefully disrupting the dispatch center to serve her overarching purpose of motivating the Sheriff's Office to respond more quickly to the gunshots.

Sullivan and Lieutenant Prescott[16] to qualified immunity as to both claims. *See Butler*, 85 F.4th at 1116; *Redd*, 140 F.3d at 1383. On this record, based on Prospero's own actions, Prospero failed to demonstrate a genuine dispute of material fact that a reasonable officer could have believed that probable cause existed to arrest Prospero for violating O.C.G.A. § 16-11-39.2(b)(2). Accordingly, we conclude that defendants are entitled to qualified immunity.

## III.    Conclusion

For the foregoing reasons, the district court should have granted Deputy Sullivan and Lieutenant Prescott summary judgment based on qualified immunity. Accordingly, we reverse.

**REVERSED.**

---

[16] We note that "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). But we agree with the district court that in this case, Lieutenant Prescott's entitlement to qualified immunity depends on Deputy Sullivan's conduct and knowledge because Deputy Sullivan took the lead on the pair's investigation and swore out the warrant affidavit. Lieutenant Prescott merely assisted Deputy Sullivan and could have intervened to stop Deputy Sullivan from seeking a warrant. Because we conclude that Deputy Sullivan did not violate Prospero's clearly established rights, neither did Lieutenant Prescott.